## BELSER v. COMMISSIONER OF INTERNAL REVENUE.

### No. 5864.

United States Court of Appeals
Fourth Circuit.

May 2, 1949.

W. Croft Jennings and Carlisle Roberts, both of Columbia, S. C., for petitioner.

Fred E. Youngman, Sp. Asst. to Atty., Gen., (Theron Lamar Caudle, Asst. Atty. Gen., and Ellis N. Slack and A. F. Prescott, Sp. Assts. to Atty. Gen., on the brief), for respondent.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

DOBIE, Circuit Judge.

This appeal, taken from a decision of the Tax Court of the United States, involves a deficiency of $3,675.66 in the federal income tax for the calendar year 1932 of Irvine F. Belser, plus a penalty of $918.92 for taxpayer's failure to file a timely return for that year.

Taxpayer's appeal questions three findings of the Tax Court:

(1) That taxpayer's stock in the Fairview Farming Company, a corporation, on which taxpayer claimed a loss in 1932, became worthless prior to that year;

(2) That taxpayer's loans to this corporation were ascertained to be worthless prior to 1932 and hence were not deductible in that year;

(3) That taxpayer's failure to file a timely return was not due to reasonable cause.

We quote the apposite federal statutes herein involved:

"Revenue Act of 1932, c. 209, 47 Stat. 169:

"Sec. 23. Deductions from Gross Income.

"In computing net income there shall be allowed as deductions:

\* \* \* \* \* \*

"(e) Losses By Individuals. Subject to the limitations provided in subsection (r) of this section, in the case of an individual, losses sustained during the taxable year and not compensated for by insurance or otherwise—

"(1) if incurred in trade or business; or

"(2) if incurred in any transaction entered into for profit, though not connected with the trade or business;

\* \* \* \* \* \*

"(j) Bad Debts. Debts ascertained to be worthless and charged off within the taxable year (or, in the discretion of the Commissioner, a reasonable addition to a reserve for bad debts); and when satisfied that a debt is recoverable only in part, the Commissioner may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction."

"Sec. 53. Time and Place for Filing Returns.

"(a) Time for Filing—

"(1) General Rule. Returns made on the basis of the calendar year shall be made on or before the 15th day of March following the close of the calendar year. Returns made on the basis of a fiscal year shall be made on or before the 15th day of the third month following the close of the fiscal year."

"Sec. 291. Failure to File Return.

"In case of any failure to make and file a return required by this title, within the time prescribed by law or prescribed by the Commissioner in pursuance of law, 25 per centum of the tax shall be added to the tax, except that when a return is filed after such time and it is shown that the failure to file it was due to reasonable cause and not due to willful neglect no such addition shall be made to the tax. The amount so added to any tax shall be collected at the same time and in the same manner and as a part of the tax unless the tax has been paid before the discovery of the neglect, in which case the amount so added shall be collected in the same manner as the tax. The amount added to the tax under this section shall be in lieu of the 25 per centum addition to the tax provided in section 3176 of the Revised Statutes, as amended." 26 U.S.C.A.Int.Rev.Acts, pages 490, 501, 566.

The taxpayer, a resident of Columbia, South Carolina, has been actively engaged in the practice of law in Columbia since 1915. In 1919 he contracted to purchase 331 acres of farm land, generally known as the DePriest tract, from one W. W. DePriest for $20,000 and another tract of about 424 acres, generally known as the Stewart tract, from John W. Stewart for $21,202.50. In making these contracts he acted for himself and three other individuals who had agreed to, and did, organize the Fairview Farming Company, a South Carolina corporation, to take title to these lands. The purpose of the company, as stated in its charter, was "to do a general farming business with power to sell, buy and mortgage real estate."

Fairview Farming Company was organized with an authorized capitalization of $25,000 represented by 250 shares of common stock of $100 par value. Each of the four incorporators subscribed for 50 shares, paying $3,600 in cash and giving his promissory note for $1,400. On March 25, 1920, a certificate for 50 shares of stock was issued by the company to each of the incorporators. On the same day two of them assigned their shares to the taxpayer and the other assigned his shares to the taxpayer's wife but the taxpayer was beneficial owner. Each transferee received from the taxpayer $3,600 in cash and the taxpayer's note for $1,500 as consideration for the assignment, but because of the taxpayer's subsequent financial difficulties payment of these notes was forgiven by the creditors.

On January 6, 1920, DePriest conveyed the 331 acre tract to the corporation, which paid him $6,666.67 cash and gave him a mortgage on the property to secure payment

of the balance of $13,333.33. On March 12, 1920, Stewart conveyed the 424 acre tract to the corporation, which paid him the $21,-202.50 in cash. The necessary funds beyond the corporation's capital were supplied by a bank loan of $10,000 secured by a mortgage on the Stewart tract, and by the taxpayer, who borrowed $12,000 by giving a mortgage on his home. These two tracts of land, the DePriest tract and the Stewart tract, were the only assets Fairview Farming Company ever owned.

The DePriest and Stewart tracts produced a good grade of upland cotton, which was being sold in 1919 at about 40 cents a pound, and all four organizers of the corporation expected to profit from their investment. But in 1920 the boll weevil attacked the area with disastrous consequences to the value of farm land, and the price of cotton began to fall, dropping to about 11 cents a pound by the middle of 1921. The price rose slowly to a high of 34.39 cents in December, 1923; in and after 1926 it fluctuated below 20 cents, and during 1932 fell to a low of five cents. The market value of land underwent corresponding fluctuations.

In 1921, there began a long, continuous and complicated series of transactions in a desperate, but futile, effort by the taxpayer to salvage something from his investment in the stock of, and his loans to the corporation. These transactions involved varied loans between the taxpayer and the corporation and several banks. There were mortgages and re-mortgages, conveyances and re-conveyances of the DePriest and Stewart tracts. And, to add to the general confusion, in 1930 a new corporation was organized which played a small part in the picture. These transactions are set out and discussed in extenso by the Tax Court in its findings of fact and in its opinion. No useful purpose would be served by our again reviewing them.

Income tax returns for the years 1920, 1921, 1922, were filed by the Fairview Farming Company, reporting little income and no tax for 1920, losses for 1921 and 1922. On this corporation's return for 1923 was written: "This company has entirely ceased to do business." In its return for 1931, the corporation reported a gross income of $100, with deductions of $100 for taxes and $600 for interest. The charter of this corporation was revoked in 1926 for non-payment of taxes.

It is elementary that as to deductions for both losses and bad debts, or other cases of deductions and exemptions from the federal income tax, the burden is squarely placed upon the taxpayer to bring himself clearly within the statutory provisions authorizing the claimed deduction or exemption. Miller Manufacturing Co. v. Commissioner, 4 Cir., 149 F.2d 421; Mahler v. Commissioner, 2 Cir., 119 F.2d 869, certiorari denied 314 U.S. 660, 62 S.Ct. 114, 86 L.Ed. 529. And federal income tax statutes have been consistently drawn with the purpose of definitely fixing, so far as is practicable, the precise year in which a deduction or exemption must be claimed, not with the idea of leaving the taxpayer the choice of a taxable year, when his claim would inure to his greatest advantage.

Under Section 23 of the Revenue Act of 1932, previously quoted, taxpayer's loss on the stock of the Fairview Farming Company can be deducted only for the year in which this loss was sustained. Hall v. Commissioner, 7 Cir., 128 F.2d 180; Keeney v. Commissioner, 2 Cir., 116 F.2d 401; Lambert v. Commissioner, 10 Cir., 108 F.2d 624. For tax purposes, the particular year in which a loss is sustained is a question of fact; and particularly in the case of property such as corporate stock, when there has been no actual sale or disposition of the stock, the determination of the year in which the loss is sustained is controlled and governed by practical, economic considerations, not by theoretical speculations. In such cases, the taxpayer must definitely establish by some identifiable event or series of circumstances that the property became worthless during the taxable year in question. A. R. Jones Oil & Operating Co. v. Commissioner, 10 Cir., 114 F.2d 642; Brown v. Commissioner, 6 Cir., 94 F.2d 101; Gowen v. Commissioner, 6 Cir., 65 F.2d 923, certiorari denied 290 U.S. 687, 54 S.Ct. 123, 78 L.Ed. 592.

Even a casual inspection of the record here will reveal that at the time of the revocation of its charter in 1926, the stock

of the Fairview Farming Company was quite worthless. In January 1924, the Stewart tract (loaded with three mortgages to secure loans amounting to $18,500) was conveyed to a bank which had obtained a personal judgment against the taxpayer. While in July 1922, the Fairview Farming Company conveyed the mortgaged DePriest tract to the taxpayer, who conveyed this tract by a mortgage deed to a bank to secure a loan of $7,200, with which to pay off the balance of the purchase price. In the light of subsequent dealings and happenings, the situation of the Fairview Farming Company, if anything, apparently went from bad to worse.

So, we certainly cannot set aside the Tax Court's finding that this stock became worthless long before 1932. Consequently, taxpayer cannot deduct his loss on the stock for the year 1932.

What has been written above is equally applicable, mutatis mutandis, to the bad debts owed by this corporation to the taxpayer. Under Section 23(j) of the Revenue Act of 1932, quoted above, bad debts are deductible only in the year in which they are ascertained to be worthless and are charged off by the taxpayer. The taxpayer kept no regular books or records, so a mental charge-off would suffice, provided it was bona fide and the debts were actually ascertained to be worthless during the year of the charge-off. Here again, the test is reasonableness, common sense and economic reality. See Nemerov v. Helvering, 2 Cir., 139 F.2d 690; Commissioner of Internal Revenue v. MacDonald Engineering Co., 7 Cir., 102 F.2d 942. Any other rule, as Circuit Judge Chase pointed out in Ludlow Valve Manufacturing Co. v. Durey, 2 Cir., 62 F.2d 508, 509, would permit the taxpayer "to wait before claiming the deduction until there should be a year in which his income would be sufficient to allow him the maximum benefit, instead of taking it as the statute required in the year when the debts were both ascertained to be worthless and charged off." We have no desire to impute bad faith to the taxpayer here, yet he did, in the year 1932, receive unusually large legal fees.

Strengthening the conclusion that the taxpayer's loans to the corporation were ascertained to be worthless prior to 1932 is the fact that, as part of one of his refinancing operations in 1930, taxpayer himself cancelled the mortgages securing these loans to enable him to again mortgage the property free of any other encumbrance. The loans were thereafter unsecured and patently worthless.

So again we must sustain the Tax Court in its finding that long before 1932, the taxpayer must have fully realized that there was no likelihood (not even a modicum of a Chinaman's chance) that he would ever realize anything on these loans.

Finally, this brings us to the question of the penalty imposed on the taxpayer for his failure to file a timely return for the year 1932. This penalty is required by Section 291 of the Revenue Act of 1932 (quoted above) except when "a return is filed after such time and it is shown that the failure to file it was due to reasonable cause and not due to willful neglect."

The taxpayer's return for 1932 was due to be filed on or before March 15, 1933. He obtained successive extensions from local revenue officials to September 15, 1933, which was the ultimate extent to which they could legally grant such extensions. When he requested a further extension beyond September 15, 1933, he was advised that no further extension could be granted and it was suggested that he should then submit an affidavit with his delinquent return, together with an explanation of the reasons for the delay. He prepared a return apparently on or before September 27, 1933, drew a check of that date for $62.05, being the amount of tax due by his computation, plus $2.10 interest and drafted a letter of the same date to the Collector, which apparently was notarized, explaining the delay. The letter and return were never received by the Collector or Commissioner; the check never cleared through the taxpayer's bank account.

An internal revenue agent called on the taxpayer in May, 1935, to inquire why he had not filed a return for 1932; but it was not until July 12, 1937 (more than four years after the date when the return was originally due), that the taxpayer tendered to the Collector a copy of the return pur-

portedly prepared in September, 1933. At the same time he filed an amended return in which certain income was excluded as non-taxable, leaving no tax due.

Taxpayer claimed that the return was mailed on September 27, 1933. On this question, the Tax Court had this to say:

"We do not doubt that a return was prepared at the time alleged, but evidence that it was mailed is not convincing. Petitioner's secretary testified that she 'probably would have mailed it right away, the same day. In fact, I'm sure I would have.' And while she made an affidavit in 1935 that she had dropped it in a mail box at the National Loan and Exchange Bank, the qualified manner of her testimony on the witness stand indicates rather an inference of mailing based on her custom in the discharge of duties rather than specific recollection in respect of this item. When the revenue agent made inquiry about the 1932 return in 1935, she made a search for the check and inquired at the bank, but found no evidence that the check had been presented or cashed, and petitioner has not produced the cancelled check or any bank statement showing a charge of his account in the amount of the check."

The Tax Court, accordingly, stated: "We cannot affirmatively find that petitioner's return was mailed" on September 27, 1933, and approved imposition of the statutory penalty of 25%. Further the Tax Court distinguished the case of Crude Oil Corporation of America v. Commissioner, 10 Cir., 161 F.2d 809. There, in upholding a presumption of receipt by the Commissioner upon proof of mailing, Circuit Judge Phillips stated, 161 F.2d at page 810, that the evidence established that the requisite return was "enclosed in an envelope, properly addressed to the Collector's office at Oklahoma City, Oklahoma, with proper postage duly affixed thereto, and *deposited in the United States mail* at Tulsa, Oklahoma, in time to have been received by the Collector, in the ordinary course of mail, within the statutory filing period." (Italics ours.)

The evaluation of testimony and the determination of what constitutes (under the peculiar circumstances of each particular case) "reasonable cause" or "willful neglect" in connection with the failure to file a timely return are peculiarly within the province of the Tax Court. In the instant case, we cannot well overturn its findings, and its holding, as to the imposition of the statutory penalty upon the taxpayer.

The decision of the Tax Court of the United States is, accordingly, affirmed.

Affirmed.