**In the Matter of CABAZON INDIAN CASINO.**

**CABAZON INDIAN CASINO, Plaintiff-Appellant,**

v.

**INTERNAL REVENUE SERVICE, Defendant-Appellee.**

**BAP No. CC–85–1006–MVAb.**

United States Bankruptcy Appellate Panels of the Ninth Circuit.

Argued and Submitted Sept. 19, 1985.

Decided Feb. 5, 1986.

---

Virginia S. Criste, Mack, Kahn & Criste, Palm Springs, Cal., Glenn M. Feldman, Ziontz, Pirtle, Morisset, Ernstoff & Chestnut, Washington, D.C., for plaintiff-appellant.

Mason C. Lewis, U.S. Atty's Office, Los Angeles, Cal., for defendant-appellee.

Before MEYERS, VOLINN and ABRAHAMS, Bankruptcy Judges.

MEYERS, Bankruptcy Judge:

The Appellant, Cabazon Indian Casino ("Casino"), which is a Chapter 11 Debtor-in-Possession, claimed an exemption from federal unemployment tax and the employer's portion of the social security tax by virtue of the Casino's status as an Indian tribe. The Casino also objected to the imposition of penalties for failure to pay these taxes. The trial court held that the Casino was not exempt from these taxes or from the penalties for failure to pay them. We AFFIRM.

## I.

### FACTS

The Cabazon Band of Mission Indians is a federally recognized Indian tribe. The Cabazon Band exercises governmental functions pursuant to Articles of Association approved by the Department of the Interior. These Articles authorized the Band to manage its economic affairs, including the establishment and operation of commercial enterprises.

Pursuant to these powers, in October of 1980, the Cabazon Band established on the reservation the Cabazon Indian Casino, an unincorporated company.[1] The Casino consists of a card parlor, restaurant and bar. Tribal ordinance regulates the playing of card games. This tribal enterprise employs approximately 75 employees whose wages are paid from Casino revenues.

The Casino is located on tribal trust land on the Cabazon Indian reservation which was established pursuant to the Mission Indian Relief Act, 26 Stat. 712, ch. 65 (1891). Consisting of arid desert land, the reservation contains no known mineral deposits or other natural resources and is unsuited for agricultural purposes. The Band uses the Casino revenues to provide government services to its members. Prior to operation of the Casino, the Band's land produced no income.

No tax returns had been prepared by the Casino until after the bankruptcy petition was filed. On February 4, 1983, the Internal Revenue Service filed its Proof of Claim for federal withholding taxes (FICA), 26 U.S.C. §§ 3101–3126, and unemployment taxes (FUTA), 26 U.S.C. §§ 3301–3311. FICA taxes were claimed for the first, second, third and fourth quarters of 1981 for a total of $181,530.24 consisting of taxes in the amount of $144,190.61, interest of $5,787.10 and penalties of $31,552.53. The Internal Revenue Service also claimed FUTA taxes for the period ending December 31, 1981, of $5,614.11. This consisted of tax in the amount of $3,048.42, interest of $1,285.35 and penalties of $1,280.34.

On May 16, 1984, the Casino filed an objection to the claim. There were two grounds for this objection: (1) the Band was exempt from these taxes as a state or political subdivision of a state under 26

---

1. From the record it appears that the status of the Casino is that of an unincorporated corporation. However, nothing turns on such an unusual status. The Supreme Court has dealt with a similar situation in *Mescalero Apache Tribe v. Jones,* where that court stated that:

"It is unclear from the record whether the Tribe has actually incorporated itself as an Indian chartered corporation pursuant to section 477 ... In any event, the question of tax immunity cannot be made to turn on the particular form in which the Tribe chooses to conduct its business."

411 U.S. 145, 157 n. 13, 93 S.Ct. 1267, 1275 n. 13, 36 L.Ed.2d 114 (1973).

U.S.C. §§ 3121(b)(7) and 3306(c)(7); and (2) the Band was exempt under the Mission Indian Relief Act. Additionally, the Casino claims that penalties should not be imposed under 26 U.S.C. § 6651, since the taxpayer claimed reasonable cause justifying its failure to file. The trial court rejected these arguments and allowed the claim.

## II.

### DISCUSSION

The language of both FICA (Federal Insurance Contribution Act) and FUTA (Federal Unemployment Tax Act) that imposes taxation on an employer is very broad. A FICA excise tax is imposed on "every employer" under 26 U.S.C. § 3111, based on wages paid to individuals in one's employment. Similarly, a FUTA excise tax is imposed on "every employer" under 26 U.S.C. § 3301.

Both FICA and FUTA contain an identically worded definition of employment. "The term 'employment' means any service, of whatever nature, performed ... by an employee for the person employing him." 26 U.S.C. §§ 3121(b) and 3306(c). Further, both FICA and FUTA contain an identically worded exception to these excise taxes for a state or any political subdivision thereof. 26 U.S.C. §§ 3121(b)(7) and 3306(c)(7). There is no specific mention of Indian tribes in any of the FICA or FUTA provisions.

The Ninth Circuit Court of Appeals has held that Indians and Indian tribes are not entitled to exemptions from federal taxation unless they fall within an express exemption or their income is directly derived from tribal lands. *Confederated Tribes of Warm Springs Reservation v. Kurtz*, 691 F.2d 878, 881 (9th Cir.1982). *See also Critzer v. United States*, 597 F.2d 708, 711–12, 220 Ct.Cl. 43 (1979) (en banc).

### A. AN INDIAN TRIBE IS NOT A STATE OR INDEPENDENT SOVEREIGN

■ We turn first to the argument that the Cabazon Band is exempt from these excise taxes because they fall within the express exemptions accorded to states and their instrumentalities. The Cabazon Band admits that neither the Internal Revenue Code nor its legislative history mentions either Indians or tribes. Nevertheless, it is argued that Indian tribes should be construed to be states because they are governmental entities with sovereign powers over both their members and their territory.

Indian tribes retain some attributes of sovereignty which the tribes exercise over both their members and territory. However, the Supreme Court has consistently found that Indian tribes are not states. The status of the tribes has been described as:

> an anomalous one and of complex character, for despite their partial assimilation into American culture, the tribes have retained a semi-independent position ... not as states, not as nations, not as possessed of the full attributes of sovereignty, but as a separate people with the power of regulating their internal and social relations, and thus far not brought under the laws of the Union or of the state within whose limits they resided.

*White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 142, 100 S.Ct. 2578, 2583, 65 L.Ed.2d 665 (1980).

Further, the Supreme Court in *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 148, 102 S.Ct. 894, 907, 71 L.Ed.2d 21 (1982), stated that Indian sovereignty is different from that of federal, state or local governments. While an Indian tribe has attributes of sovereignty, it is not a state. Thus, it cannot claim the exemption from excise taxes that is accorded to a state.

Further, Indian tribes were not mentioned in either FICA or FUTA. The Ninth Circuit, in holding that Indian tribes were not exempt from federal excise taxes on fuel and motor vehicles, refused to find that Indian tribes qualified under a similar

exemption for states. *Confederated Tribes, supra,* 691 F.2d at 880.[2]

We must also reject the argument that an Indian tribe can qualify for an exemption as a local government, claiming the status of an instrumentality of a state. The Ninth Circuit Court of Appeals in *Confederated Tribes,* held that a tribe is not a political subdivision of a state. "It derives no authority from the state ... The state and the Tribe each functions within its proper sphere. Neither is a creature of the other." 691 F.2d at 880.[3]

### B. THERE ARE NO IMPLICIT EXCEPTIONS TO THE TAX CODE

■ Lacking an express exemption under the Internal Revenue Code, the Cabazon Indian Band would have us construe FICA and FUTA to exempt the Band from taxation because of an expressed policy of Congress and the Administration to foster tribal self-determination and economic development. Ambiguous statutes and treaties are to be construed in favor of Indians. *Confederated Tribes, supra,* 691 F.2d at 881; *United States v. Anderson,* 625 F.2d 910, 913 (9th Cir.1980). However, the Supreme Court has repeatedly held that tax exemptions are not granted by implication. *See Mescalero Apache Tribe v. Jones,* 411 U.S. 145, 156, 93 S.Ct. 1267, 1274, 36 L.Ed.2d 114 (1973). A court is not free to create ambiguities in order to construe

them in favor of the interests of Indians. *Confederated Tribes, supra,* 691 F.2d at 881. *See also Fry v. United States,* 557 F.2d 646, 649 (9th Cir.1977). Further, the Ninth Circuit has held that silence alone cannot create an implied immunity from federal excise taxes. *Confederated Tribes, supra,* 691 F.2d at 880–882. Thus, no matter how persuasive the policy argument, we are not free to create an exemption in FICA or FUTA without express language.

### C. NO TREATY EXEMPTION EXISTS

Our inquiry is not limited simply to an examination of the Internal Revenue Code. Federal statutes and treaties dealing with particular Indian tribes can grant an exemption from federal taxation. *Squire v. Capoeman,* 351 U.S. 1, 6, 76 S.Ct. 611, 614, 100 L.Ed. 883 (1956). Courts will imply a tax exemption from a statute or treaty that contains express exemptive language. 351 U.S. 1 at 6–9. We, therefore, examine the Mission Indian Relief Act of 1891, 26 Stat. 712, ch. 65, under which the Cabazon Band's reservation was created. This Act, unlike the Act analyzed in *Confederated Tribes,* does contain a tax exemption for income derived directly from the land, but it does not contain an exemption from excise taxes.

**2.** It is worth noting that *Confederated Tribes* has been reversed by statute. 26 U.S.C. § 7871 (1984) allows the Secretary of the Treasury in consultation with the Secretary of the Interior to determine that an Indian tribe shall be treated as a state for purposes of exemption from certain excise taxes. The excise taxes involved are carefully enumerated. The Cabazon Band admitted that they have no exemption from FICA and FUTA taxes under Section 7871. In addition, for an exemption to apply under Section 7871 for any particular transaction, the tribe must be acting in exercise of a governmental function. A casino cannot so qualify. Passage of Section 7871 by Congress indicates that Congress knows how to exempt an Indian tribe from excise taxes. Congress chose only to exempt Indian tribes from certain excise taxes and then only in some instances.

**3.** The Ninth Circuit held that an entity will qualify as an instrumentality of a state for purposes of federal excise tax exemption only if it possesses at least some portion of the state's sovereign powers or performs traditional government functions. *Washington State Dairy Products Commission v. United States,* 685 F.2d 298, 300 (9th Cir.1982). It is clear that the Casino does not and cannot qualify as an instrumentality of any state government. Unlike state governments "the right of tribal self-government is ultimately dependent on and subject to the broad power of Congress." *White Mountain Apache Tribe, supra,* 448 U.S. at 143, 100 S.Ct. at 2583.

The argument that Indian tribes are treated as local governments under statutes other than the Tax Code is unpersuasive. Indian tribes have been treated as local governments under the National Housing Act of 1937, 50 Stat. 888, and under 25 U.S.C. § 293a, which involves transfer of Indian school lands to local governments. Classifications made by Congress under other statutes are not controlling in tax cases. *Confederated Tribes, supra,* 691 F.2d at 880, fn. 1.

The Mission Indian Relief Act reads in pertinent part: "The United States will convey the same [land] by patent to the said Indian, or his heirs as aforesaid, in fee, discharged of said trust and free of all charge or incumbrance whatsoever." 26 Stat. at 713, Sec. 5. While this statutory provision is not expressly couched in terms of nontaxability, the Supreme Court has interpreted almost identical language to confer immunity from income tax and capital gains taxes. *Squire v. Capoeman, supra*, 351 U.S. at 6–7, 76 S.Ct. at 614–615. The Supreme Court held that the exemption accorded tribal and restricted Indian lands extends to the income derived directly therefrom. The purpose of the exemption inherent in restricted Indian land was to prepare the Indian to take his place as a qualified member of the body politic. To that end it was necessary to preserve the land held in trust and the income derived directly from that land, "but it is not necessary to exempt *reinvestment income* from tax burdens" (emphasis added). 351 U.S. at 9, 76 S.Ct. at 616.

The Ninth Circuit has held that Section 5 of the Mission Indian Relief Act has the same effect as to taxability of allotted lands as Section 6 of the General Allotment Act which was the act construed in *Squire v. Capoeman*. *Kirkwood v. Arenas*, 243 F.2d 863, 866 (9th Cir.1957). Thus, it is clear that the land of the Cabazon Band and the income derived directly therefrom is free from taxation.

■ The question remains as to whether an excise tax imposed on an Indian Band for its casino employees is a tax on income derived directly from the land. To the extent that this question involves a tax imposed directly on the Tribe, it is a case of first impression.

The tax exemption for income derived directly from the land has been construed rather narrowly by the courts. The Supreme Court in *Squire v. Capoeman*, held that this exemption did not apply to reinvestment income for an individual Indian.

What constitutes income derived directly from tribal lands was analyzed most exhaustively in *Critzer v. United States, supra*, 597 F.2d 708, relied upon by the trial court. The *Critzer* court held that income realized by an Indian landholder was not exempt from income tax simply because the business and building which generated the income was located on tax-exempt Indian reservation land. In *Critzer*, the taxpayer was an Indian who operated a motel, restaurant, and gift shop, all of which were situated on reservation land. The *Critzer* court found that the income was not generated out of the land alone. While the land was necessary, the income was generated by the labor of the taxpayer, her employees and by reinvested income invested in the property. It concluded, therefore, that the income was not directly connected to the land.

The same reasoning applies to the Cabazon Indian Casino. The income derived from operating the casino stems in a far more important fashion from card playing, liquor sales and food preparation, than it does from the land alone. Indeed, apart from the capital improvements on the land, there would be little if any income derived directly from the land itself.[4]

Also, this Panel is persuaded by the same policy considerations that influenced both the *Critzer* court and the trial court. In *Critzer*, the court found that it would be ludicrous to argue that all income derived from any business conducted on tribal land

---

**4.** Since this case involves the taxation of an Indian tribe, not an individual Indian, the Cabazon Band has cited several Revenue Rulings which state that Indian tribes and Indian corporations are not taxable on income derived from activities carried on within boundaries of the reservation. Rev.Rul. 67–284 and Rev.Rul. 81–295. However, the statement that "income tax statutes do not tax Indian tribes", Rev.Rul. 67–284, was made without any supporting citation.

After *Confederated Tribes*, such a policy in regard to excise taxes is clearly not the law in the Ninth Circuit. Additionally, Revenue Rulings do not have the force of law. An erroneous Revenue Ruling cannot in and of itself bar the United States from collecting a tax otherwise lawfully due. *Washington State Dairy Products Commission, supra*, 685 F.2d at 300; *Confederated Tribes, supra*, 691 F.2d at 881, fn. 2.

was immune from taxation simply because the land itself was immune from taxation. 597 F.2d at 713. Otherwise, any business conducted on tribal land would be exempt, for any income producing activity must have some relationship to the land. As the *Critzer* court stated:

> The benefits sought by the instant taxpayer were designed, many years ago, to shield an oppressed and unsophisticated people. Congress could not have intended that its laws would be used as a sword by which one group of businessmen could obtain perpetual and total tax shelters that are unavailable to all others, including Indians who have left their reservations to establish businesses elsewhere.

597 F.2d at 714

Similarly, the court in *Hale v. United States*, 579 F.Supp. 646, 648 (E.Wash.1984), held that income an Indian derived from the lease of allotted land and a small building on it which was used as a smokeshop was not tax-exempt. To be directly derived from the land, income must be from the exploitation of the land itself by mining, logging, agriculture or similar activity, not just the land's location. *Accord, Cross v. Commissioner*, 83 T.C. 561, 568 (1984).

Although the *Critzer* court and the *Hale* court dealt with individual taxpayers and not with a tribe, we adopt the reasoning of these two courts to hold that the income generated by the Casino is not directly derived from the land. Therefore, we hold that excise taxes under FICA and FUTA may be imposed. If the Panel were to hold otherwise, it would have to find that virtually any activity conducted by the Cabazon Indian Band on their land would be tax-exempt.

### D. THE BAND IS LIABLE FOR PENALTIES AND INTEREST

The trial court imposed penalties and interest for the Tribe's failure to file tax returns and to pay excise taxes under 26 U.S.C. §§ 6601 and 6651.

Under Section 6601, payment of interest on the underpayment of tax is required. There is no provision in the statute for an exception.

There is a provision for an exception from the penalty for failure to file a tax return under Section 6651. This penalty will not be imposed if "it is shown that such failure is due to reasonable cause and not due to willful neglect." 26 U.S.C. § 6651. The trial court found that the Cabazon Band had not made this showing.

█ It is true that a taxpayer should not be penalized for making an honest effort upon reasonable grounds to avoid what he in good faith believes to be an unreasonable extraction. *Economy Savings & Loan Co. v. Commissioner*, 158 F.2d 472, 474–475 (6th Cir.1946). Also, considerations that are not adopted by a court can constitute reasonable cause and thus avoid penalties. In construing what constitutes "reasonable cause" for failure to file, courts have given great weight to the complexity of the legal issues involved. *Dillin v. Commissioner*, 56 T.C. 228, 248 (1971). Here the underpayment was due to an intentional disregard of established rules and regulations.

One is not free to ignore established case law. The entire body of legal authority is clearly against the Casino's position. Arguments urging us to ignore precedent, however ingenous and even though adopted by the dissent, cannot serve as the basis for finding that the trial court abused its discretion in imposing penalties. Arguing that case law such as *Critzer* was wrongly decided violates the *Dillin* test by intentionally disregarding established law. 56 T.C. at 248. Otherwise, any party that can develop plausible policy arguments, even in settled areas of tax law, would be free to speculate in litigation at the government's expense without fear of penalty.

Given case law such as *Critzer*, the legal issues decided today were not of great complexity.[5] The record below indicates that

---

5. The relevant decisions all undercut the posi-    tion of the Cabazon Band. *See Confederated*

failure to file tax returns was based on an intentional disregard of the law and was not based on reasonable cause.[6]

In its statement of financial affairs filed on December 19, 1981, the Band stated, "No tax returns have been prepared since the commencement of the business; petitioner claims it has sovereign immunity as to income tax, however other taxes are believed to be due." Only after the government filed its claim did the Cabazon Band have accounting work done to determine which taxes they should be paying. Only after this work was finished in May of 1984 did the Band object to the IRS's claim. We would be more sympathetic to the Band's argument that reasonable cause existed if the Band had analyzed its rights before failing to file tax returns, not three years after its failure to do so.

The decision of the trial court is AFFIRMED.

VOLINN, Bankruptcy Judge, dissenting.

## I. FACTS

The essential facts in this matter are simple and not in dispute. The appellant, Cabazon Indian Casino (herein "Casino"), is an unincorporated business entity established and solely owned by the Cabazon Band of Mission Indians (herein "Tribe"), a federally recognized Indian tribe. The Casino functions as a card parlor, restaurant and bar and is located entirely on tribal trust land established as an Indian reservation pursuant to the Mission Indian Relief Act, 26 Stat. 712, ch. 65 (1891). The land is desert land devoid of mineral or other natural resources and is not suited to agricultural use. Prior to tribal operation of the Casino the land produced no income. Through operation of the Casino the Tribe provides jobs for seventy-five people and generates revenue to provide government services to tribal members.

As debtor-in-possession, the Casino claims to be exempt from federal unemployment taxes and the employer's portion of the social security tax. The Tribe claims an express exemption, by analogy, to the exemption in the Tax Code for States and political subdivisions and alternatively claims exemption as an Indian tribe deriving income directly from reservation land. It also asserts, in any event, that it is not liable for payment of penalties because its nonpayment is based upon a good faith belief that taxes are not due.

The respondent, United States Internal Revenue Service (herein "Government") asserts a claim for the unpaid taxes and accrued statutory penalties.

The trial court allowed the Government's tax claim and the assessment of penalties.

## II. DISCUSSION

### 1.

The majority has correctly stated the general law regarding federal taxation of Indian tribes. Tax exemptions are not granted by implication. *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 156, 93 S.Ct. 1267, 1274, 36 L.Ed.2d 114 (1972). However, Indian tribes, by treaty or statute, may be exempt from taxation if their in-

---

Tribes, *supra*, 691 F.2d 878; Critzer, *supra*, 597 F.2d 708. A case relied upon heavily by the Cabazon Band, *Wisconsin Winnebago Business Comm. v. Koberstein*, 762 F.2d 613 (7th Cir. 1985), does not change this result. Therein, the Seventh Circuit interpreted a statute, 25 U.S.C. § 81, that does not deal with taxation. Under 25 U.S. § 81, all contracts that are "relative to their [Indian] lands" must first be approved by the Department of the Interior. The Seventh Circuit held that a contract to run a bingo game was relative to the land. This test is less stringent than the "directly derived" test since it can include things that are indirectly related to the land.

6. An appellate court is reluctant to reverse a trial court on the determination of whether a party has made a sufficient showing to establish reasonable cause and thus avoid a penalty. *Belser v. C.I.R.*, 174 F.2d 386, 391 (4th Cir.1949), *Paymer v. C.I.R.*, 150 F.2d 334, 337 (2nd Cir. 1945). The Second Circuit in *Paymer* has found that the determination of whether or not reasonable cause has been shown turns upon the particular circumstances of the case presented and, thus, is not a reviewable issue. 150 F.2d at 337. *Accord, Belser, supra*, 174 F.2d at 391.

come falls within an express exemption or, if their income is derived directly from tribal lands. *Squire v. Capoeman,* 351 U.S. 1, 76 S.Ct. 611, 100 L.Ed. 883 (1956), *Confederated Tribes v. Kurtz,* 691 F.2d 878 (9th Cir.1982).

Contrary to appellant's contention, an Indian tribe is not a State nor is it the instrumentality of a State and therefore it is not tax exempt under any exemption for States. It is also clear that neither the tax code nor its legislative history, except for recent specific exemptions noted by the majority, mention Indian tribes. Hence, there is no express exemption from federal taxation as to the taxes involved here.

The Tribe's alternative contention, that the income is not subject to tax because it is derived directly from the land, is a more difficult issue to resolve.

Indian tribes are sovereign entities possessing all of the attributes of sovereignty except as relinquished through treaty with the United States or to the extent altered by Congress through legislation. This was first recognized by the Supreme Court in *Worcester v. Georgia,* 31 U.S. (6 Pet.) 515, 8 L.Ed. 483 (1832). The court has never waivered in recognition of that sovereignty. *See e.g. Williams v. Lee,* 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959); *McClanahan v. Arizona Tax Comm.,* 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973).

Nonetheless, relative to the United States, the tribes stand in the relationship of ward to guardian. *U.S. v. Rickert,* 188 U.S. 432, 437, 23 S.Ct. 478, 480, 47 L.Ed. 532 (1903). Judicial interpretation of treaties and acts of Congress dealing with Indians is to be liberal and any doubtful expressions are to be resolved in the best interests of the Indians. *Carpenter v. Shaw,* 280 U.S. 363, 367, 50 S.Ct. 121, 122, 74 L.Ed. 478 (1930); *Jones v. Meehan,* 175 U.S. 1, 20 S.Ct. 1, 44 L.Ed. 49 (1899). U.S. ex rel. *Hualpai Indians v. Santa Fe Pacif-*ic *Railroad,* 314 U.S. 339, 62 S.Ct. 248, 86 L.Ed. 260 (1941). It is not to be lightly assumed that the Congress intended to tax the ward for the benefit of the guardian. *Squire v. Capoeman,* 351 U.S. at 8, 76 S.Ct. at 615.

The *Squire v. Capoeman* case, which precluded taxation of income directly derived from the land, has been uncontroverted and followed by case law for some twenty years.[1]

2.

The Cabazon Band's reservation was created by the Mission Indian Relief Act of 1891, 26 Stat. 712, ch. 65, which contains the provision that "[t]he United States will convey the same [i.e. land] to the said Indian, or his heirs as aforesaid, in fee, discharged of said trust and free of all charges or incumbrance whatsoever." 26 Stat. at 713, Sec. 5. The Ninth Circuit has held that this section provides that income derived directly from the land is not subject to taxation and construed it as having the same effect as similar language in Section 6 of the General Allotment Act which was construed in *Squire v. Capoeman, supra. Kirkwood v. Arenas,* 243 F.2d 863 (9th Cir.1957). The reason for this is that taxes, if not paid, may become a charge or encumbrance on land.

Consequently, if the income from the Casino, which is located on tribal trust land, is deemed to be income directly derived from the land it is free from taxation. The majority concludes that income from the Casino is not directly related to the land and is therefore subject to taxation. I believe that this conclusion is unwarranted and the cases upon which the majority relies are inapposite.

The income from the Casino is sufficiently related to the land so as to preclude taxation as held in *Squire v. Capoeman,*

---

1. The Internal Revenue Service has observed this provision in accordance with the liberal construction standard of *Carpenter v. Shaw, supra.* See Rev.Rul. 67–284 and Rev.Rul. 81–291 holding income tax statutes do not tax Indian tribes and tribal corporations. The IRS, if it felt that public policy should be otherwise, presumably would not have made these rulings. Its conclusions are entitled to consideration. *See Confederated Tribes v. Kurtz,* 691 F.2d at 881, n. 2.

*supra,* which is controlling here. That case involved income from the harvesting of timber from reservation land. The court emphasized that, since timber production constituted the major value of the allotted land, unless such income was preserved for the Indian, his chances of competing economically with non-Indians would be diminished. *Id.,* 351 U.S. at 10, 76 S.Ct. at 617.

Several cases subsequent to *Squire v. Capoeman* have found certain kinds of income to be income not directly derived from the land so as to fall under the *Squire v. Capoeman* exemption. Appellee asserts that these decisions require a restricted view as to the exemption claim of the Cabazon Tribe. This rule of construction is inappropriate in the context of the issue before us. Moreover, a review of the facts in those cases reveals that they involve types of income which, for one reason or another, do not relate directly to tribal land, or do not involve tribes accorded tax exemption by treaty or statute.

*United States v. Anderson,* 625 F.2d 910 (9th Cir.1980), concerned income derived from the lease of the land of *other* Indians rather than, as here, the tribe's own use of its own land.

*Fry v. United States,* 557 F.2d 646 (9th Cir.1977) involved tribal income from subcontracts it held with a non-Indian business which leased reservation land. Again, the Cabazon Tribe is the owner of the business which is located on tribal land.

*Mescalero Apache Tribe v. Jones,* 411 U.S. 145, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973) involved state taxation of income from an *off-reservation* tribal enterprise, not the direct taxation of an on-reservation source of income.

*Confederated Tribes v. Kurtz, supra,* did not involve a treaty or statute containing the language from which the "directly derived" preclusion arises and hence that case is not precedent for this one in which a preclusive statute is involved. Indeed, *Kurtz* strongly suggests that were there a

treaty or statute of the kind involved here, the ruling there would have been as in *Squire v. Capoeman, supra.*

The foregoing cases are not so much interpretations as dispositions based on specific factors, absent here, such as income from non-reservation lands, secondary income, or land not granted income exempt status by treaty or statute. In this case there is no question that the income is derived from expressly exempted land. The basic issue involves interpretation of the word "directly." Thus, *Squire v. Capoeman* is the relevant authority.

3.

The case relied upon by the majority which involves facts similar to the case at bar is *Critzer v. U.S.,* 597 F.2d 708, 220 Ct.Cl. 43 (1979), a United States Court of Claims decision.[2] I respectfully submit that the *Critzer* case was erroneously decided.

The *Critzer* court held that income of an individual Indian landowner which was derived from a business operated in a building located on trust land was not tax exempt. The business was a motel and restaurant and gift shop. The court recognized that the land was necessary to generate the income but the income was *also* the result of the taxpayer's labor and there was an element of reinvested income in the business. Because the income did not derive "from the land alone" it was not direct enough for the *Critzer* court to find it tax exempt. *Id.,* 597 F.2d at 713. According to an analogy in *Critzer,* ownership and operation of a motel is more like the sale of stocks from a phone booth than the sale of timber removed from the land as in *Squire v. Capoeman* or income from farming as in *Stevens v. Comm.,* 452 F.2d 741 (9th Cir. 1971).

However, *Squire v. Capoeman* does not hold that income directly derived from the land must derive from the land alone nor does it hinge upon an analysis of the mix-

---

2. This case was followed by *Hale v. U.S.,* 579 F.Supp. 646 (E.D.Wn.1984) which held that Tribal income in the form of rent derived from

lease of allotted land for operation of a smokeshop business was not exempt from taxation.

ture of personal services, labor and reinvestment income with the land. Even agriculture, particularly in modern times, can involve the interposition of machinery and labor to a substantial degree. Also, any business requires some degree of reinvestment of income. This is the nature of most enterprises, agricultural, mining, hotel or otherwise.

The *Squire v. Capoeman* decision clearly defined direct income in terms of original income *vis a vis* reinvestment of that income by distinguishing *Superintendent of Five Civilized Tribes v. Commissioner*, 295 U.S. 418, 55 S.Ct. 820, 79 L.Ed. 1517 (1935), which involved " 'income derived from investment of surplus income from land,' or income on income, which Cohen termed 'reinvestment income.' " *Id.*, 351 U.S. at 9, 76 S.Ct. at 616. The Court determined that it was necessary to preserve the trust and exempt the income directly derived therefrom but not reinvestment income. Any other reading of the term "direct income.' " (as the obverse of reinvestment income) cannot receive support from *Squire v. Capoeman* which is the authority for the term.

The *Critzer* court, however, chose to emphasize aspects of the motel and restaurant business which make that business appear less closely related to the land upon which it is located than raising crops or cattle, cutting timber, or mining. On balance, the *Critzer* court determined, without analysis or quantification, that the income from a motel is not "primarily" derived from the land.[3]

*Critzer*, in addition, has misread *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973). That case endorsed *Squire v. Capoeman* and pointed out in footnote 12, p. 123: "In contrast to *Squire*, we find nothing fundamentally inconsistent with the intent of the Indian Reorganization Act in permitting gross receipts of the Tribe's *off-reserva-*

*tion* enterprise to be subject to nondiscriminatory state taxes." (emph. supp.)

As *Critzer* points out, in *Mescalero*, the land was tax exempt under a federal statute, 25 U.S.C. § 465, but that statute does not, as in the type of case before us, involve statute or treaty language of the kind ruled on by *Squire v. Capoeman.* The statute in *Mescalero* simply exempted from taxation gross income from the use of U.S. Forest Service scenic land. Since the land in question was not Indian reservation land held in trust, there could be no issue as to encumbering such land.

In the context of federal Indian law the *Critzer* court's resolution of, at best, a doubtful issue against appellant is questionable. The issue before us concerns a federally recognized Indian tribe. It is settled law that close or doubtful issues should be resolved in favor of, not against, the tribe. Courts should not weigh shades of meaning, possible interpretations, and construct far-removed analogies to reach a result that burdens the tribe with the subject taxes. *See Stevens v. C.I.R.*, 452 F.2d 741, 744 (9th Cir., 1971) citing from *Carpenter v. Shaw*, 280 U.S. 363, 367, 50 S.Ct. 121, 122, 74 L.Ed. 478 (1930). "Doubtful expressions are to be resolved in favor of the weak and defenseless people who are wards of the nation, dependent on its protection and good faith."

If the question of income "directly derived" is examined in a practical sense, I agree that a business selling stocks and bonds, operated from a phone booth, and netting a million dollars a year would present a question as to the relationship of income to the use of the land. But, where there is significant use of real property as from a farm or timber operation or the operation of businesses in substantial structures necessarily involving use of the real estate for the structures, utilities, roads for access, parking, etc., it is another matter. There may be a question as to

---

**3.** The concept of land or real estate encompasses the improvements on it. It would be beyond the scope of this opinion to expand on the character of major income producing structures such as hotels, resorts, office buildings and shopping centers, other than to take judicial notice of that character as real estate.

precisely where the line is to be drawn separating derivation from the land from non-derivation from the land. But a basic consideration should be the intention of Congress to transform wards of the government into economically independent people. They should be encouraged to put the land to use.

Presumably, as Indians become economically viable, Congress will release the land from the trust relationship. When that time comes the land is to be unencumbered. That is why the General Allotment Act and the Mission Indian Relief Act provide that there can be no taxation of income from the land because that taxation might become a charge against the land.

In the light of this expressly stated purpose, it is inappropriate to view the issue of income "directly derived," as defined in cases such as *Squire v. Capoeman*, with a finely spun negative perspective. The basic rule of construction requires an outlook favorable to the economic emancipation of the Indians free of encumbrances.

It is in fact natural to assert that income derived from an on-reservation business is income derived from the land. The majority itself asserts that "prior to operation of the Casino, the Band's land produced no income." While it is possible that the Tribe could establish a business upon leased premises off the reservation, it instead chooses to operate from reservation land. That is, quite likely, not a matter of happenstance. To begin with, the land is owned by the Tribe, at least beneficially. Further, by operating on the reservation the Tribe escapes state and local taxes and other regulations which cannot reach on-reservation, tribally-owned businesses. Thus, the Tribe may derive a competitive advantage over similar, non-Indian businesses which must pay such taxes and meet such regulations and pass that cost of doing business on to their customers. The development and operation of enterprises

based on tax consequences, if this is a consideration, is not an unusual event. It is a significant factor throughout our economic system.

It may also be that the casino gambling business is not legal in the surrounding area and hence the reservation status of the land on which the business is located is essential in the legal operation of a business for which there is a local demand but no other local supply.[4]

Consequently, the land, and most particularly the status of the land as reservation land, is crucial to the tribal business. Certainly the business may involve some reinvestment of income. Any enterprise in modern times, in order to be economically viable, whether agricultural, mining, logging, or otherwise, involves the mixture of labor and equipment with the real estate on which it is located. Businesses involving personal services, equipment, and the substantial use of land should not be limited to the foregoing basic activities. There are many options for the use of land. Indians should not be confined, in distinction to the infinite opportunities afforded the community at large, to land use limited to these traditional occupations. The essential fact here is that the business is owned by Indians and located on tribal land. There is no use to which the tribe can put the land in question other than the establishment of an economic activity which will draw customers onto reservation land to spend their money within structures built on the land for the purpose of housing and conducting the activity. The happenstance that exemption from taxation might bring about an economic advantage should be a neutral factor. Again, economic motivations in the business community at large are not infrequently founded on tax considerations. Decisions as to use of tribal land presumably will be likewise affected.

---

4. Certain kinds of business or enterprise may incur public approbation—or disapprobation. In the context of the issue before us, however, as to whether income from the activity is subject to taxation, the nature of the business should not be germane. It may also be noted that the states are becoming involved with gambling of all sorts, e.g., casinos, horse and dog racing, and lotteries.

The majority weighs distinctions regarding the degree to which personal services, labor and reinvestment income are involved in the business and finally concludes, without giving consideration to the necessity of land use for income production, that the Casino's business is so dissimilar to a logging operation that it cannot be tax exempt. Such a distinction is artificial, ignores the essential relationship of the business to tribal land, and fails to apply the long standing principle that doubtful issues should be construed favorably for the tribe.

As to the penalty and interest issue, on the basis of the views expressed here, it should not be a factor. In any event, there is no reason to find or conclude that the failure to pay was not attributable to a *bona fide* belief that the Tribe was exempt from these taxes. Under those circumstances, award of a penalty against the Tribe is inappropriate.

I therefore am constrained to dissent.