Amy T. CRITZER

v.

The UNITED STATES.

No. 134–75.

United States Court of Claims.

April 18, 1979.

Charles A. Hobbs, Washington, D. C., attorney of record, for plaintiff. Wilkinson, Cragun & Barker, Herbert E. Marks, Jerry R. Goldstein, Washington, D. C., Coward, Coward & Dillard, Orville D. Coward, and Roger L. Dillard, Jr., Sylva, N. C., of counsel.

M. Carr Ferguson, Asst. Atty. Gen., Washington, D. C., for defendant. Theodore D. Peyser, Jr. and Gilbert W. Rubloff, Washington, D. C., of counsel.

Before FRIEDMAN, Chief Judge, and DAVIS, NICHOLS, KASHIWA, KUNZIG, BENNETT, and SMITH, Judges, en banc.

## OPINION

KUNZIG, Judge:

In this income tax case of first impression, plaintiff Amy T. Critzer, an enrolled member of the Eastern Band of Cherokee Indians (the Tribe), operates several businesses and derives income from certain leases on buildings, all of which are physically located on tax-exempt reservation land. The issue is whether or not the income received from the operation of the businesses and the building leases is exempt from federal income tax. We hold that it is *not* exempt.

During the year 1971, plaintiff operated a 50-unit motel, a 284-seat restaurant, and a gift shop. She also rented out two craft shops and certain apartments. All of these structures are located on the federally-owned Eastern Cherokee Reservation (the Reservation) in North Carolina.[1] All Reservation lands are owned by the United States in trust for the Tribe pursuant to the Act of June 4, 1924, 43 Stat. 376, 25 U.S.C. § 331 (note). Under this 1924 Act, the lands were to be allotted to the individual members of the Tribe. Before any allotments were made, however, Congress passed the Indian Reorganization Act of 1934, 48 Stat. 984, 25 U.S.C. § 461 et seq., precluding further allotments.

The Tribe has allowed its members to use designated portions of the Reservation land on a continuous and exclusive basis. The right of a Tribe member to use a specific parcel of property is based upon historical use by the individual or his family. In 1960, the Tribe began issuing Certificates of Possessory Holding[2] to record formally an individual's exclusive right to use parcels of Reservation land. Prior to 1960, this right had been recognized simply by tribal resolution. A Certificate of Possessory Holding reserves to the holder the right to construct buildings and other improvements which are considered the personal property of the holder and in which the Tribe has no interest. There is also a limited right to transfer the holding to other members of the Tribe. Upon the death of a possessory holder, the Tribe normally permits his interest to pass to his devisees or heirs under North Carolina law, provided they are members of the Tribe.[3] The Tribe cannot reassign a possessory holding without providing due process rights to the incumbent holder.

If the land is commercially rented, the tribal member receives 70 percent of the rents, and the Tribe receives the balance. (If the land is improved, the member receives 80 percent.) Leases must be approved by the Tribal Council and the Department of the Interior. The Tribe receives 10 percent of the proceeds from the sale of minerals found on the land. A member of the Tribe can retain the entire proceeds of a sale of a possessory holding to another member of the Tribe.

---

1. The Reservation consists of approximately 56,000 acres, and the Tribe currently has about 5,000 members.

2. Pursuant to the Tribal Code, the Certificate expressly provides that legal title is vested in the United States in trust for the Tribe. The Tribe reserves the power to control leasing, transfers, and inheritance of holdings, to grant or create easements and rights-of-way, and to zone the land. The Tribe also has the right to all minerals and the power to control the cutting of timber on the holding.

3. Non-member spouses of deceased members have use rights for life.

A possessory holding is not an allotment, but differs only in the fact possessory holdings can never ripen into fee title. The Indian Reorganization Act of 1934, ch. 576, 48 Stat. 984, 25 U.S.C. § 461 *et seq.*, precluded further allotments in order to halt the practice of many Indians who would receive fee title and promptly sell the land, leaving themselves without any means ·of support and adversely affecting the unity of the Tribe.

Plaintiff Critzer was born on the Tribe's Reservation in western North Carolina. After a twenty-year career as a Registered Nurse, Mrs. Critzer returned to the Reservation in 1953. At that time, her assets consisted of about $1,000, some stock, half of a possessory interest in the reservation land underlying the six-unit Cool Waters Motel, and a half interest in the motel, which she had inherited from her father. (The other half-interest in the land and motel was left to Mrs. Critzer's twin sister, Marion T. Parton.) The motel had been in disuse for about 30 years and lacked the proper furniture and facilities; however, it was situated on a main highway among beautiful mountains and a scenic creek, and was thus favorably located for tourists.

The two sisters started operating the motel, but Mrs. Parton died in late 1953, leaving her half interest to plaintiff. Mrs. Critzer and her husband began improving the property, gradually expanding the number of rooms from six to fifty by 1965. Using revenues from the operation of the motel and other of plaintiff's business interests, and several small bank loans, capital investments totalling over $233,000 were made. These improvements included air conditioning, television sets, a swimming pool, and a tennis court.

In 1965, plaintiff constructed a 284-seat restaurant on the property across the high-way from her motel. The cost of the building, furniture and fixtures exceeded $90,-000. She also added a gift shop.

Mrs. Critzer has further interests in other land on the Reservation she acquired through purchase and inheritance, and full interest in a parcel of reservation land known as the Old Post Office Lot. She repaired the building on this lot and operated it as a craft shop until 1963. In 1968, Mrs. Critzer replaced the existing building with a larger structure containing a craft shop and four rental apartments. This new structure cost $50,000, $10,000 of which was obtained as a loan and repaid from plaintiff's income.

She had also inherited from her sister an interest in a parcel of reservation land known as the Old Filling Station Lot. After operating a craft shop there for several years, she constructed a new building (at a cost of $10,000) and then continued her craft shop business there until 1963. At that time, she leased the building to a non-member of the Tribe who continued to operate it as a craft shop.

Thus, during the year in question (1971), plaintiff received income from the operation of the restaurant,[4] gift shop, and motel,[5] from the rental of the craft shops and apartments,[6] and interest and dividends. Mrs. Critzer concedes the taxability of the interest and dividends, but contests the taxability of all other 1971 income, which she reported and paid taxes on in the amount of $8,941.59. She then filed a claim for refund in this court. The IRS counterclaims for $6,622.76 (a $4,206.22 deficiency, plus penalty and interest). Thereafter the tax exemption problem was severed by the Trial Judge who recommended a decision on this issue for plaintiff. The Government now contests this recommendation, and the ques-

---

**4.** In 1971 the restaurant was open from mid-May to October. During this time it was operated by a chef who supervised the other five employees and handled purchasing of supplies. Salaries of restaurant personnel exceeded $40,-000 that year.

**5.** In 1971 the motel was open from May to October, employing eight people whose combined salaries exceeded $29,000.

**6.** Plaintiff's 1971 tax return shows rental income of $5,280 for the craft shop and $1,000 for one of the apartments.

tion of exemption is the sole issue before us at this juncture.[7]

Plaintiff argues first and foremost that her business and leasing income is clearly exempt under § 21 of the 1924 Act, although acknowledging the courts have held income must be directly derived from the land. She claims it is so derived. Defendant disagrees.

Mrs. Critzer further claims her argument gets an added boost since as long ago as 1903 in *United States v. Rickert*, 188 U.S. 432, 23 S.Ct. 478, 47 L.Ed. 532 (1903), the Supreme Court held that if the Indian land is tax-exempt, the exemption applies to permanent improvements as well.

Defendant counters that plaintiff's second point assists her in no way whatsoever because the *Rickert* case applies only to property taxes, not income taxes (as here).

We hold for the Government.

## I.

Indians, like all other citizens, are subject to the federal income tax unless some provision of a statute or a treaty expressly and specifically confers an exemption. Section 21 of the 1924 Act is such a statute:

> That all lands, and other property, of the band, or the members thereof, except funds held in trust by the United States, may be taxed by the State of North Carolina, to and including the tax year following the date of this Act. Such taxes shall be paid from the common funds of said band for such period, except upon such tracts as shall have been lawfully sold prior to the date when tax assessments can be made thereon under the State law. All tax assessments made pursuant to this Act on restricted allotments or undivided tribal property held in trust by the United States shall be subject to revision by the Commissioner of Indian Affairs for a period of one year following the date when such assessments are spread on the local tax rolls, but if he shall take no action thereon during said year, such assessments shall be final, but this shall not be construed to deprive any allottee of any remedy to which he would be entitled under the State law: Provided, That such restricted and undivided property shall be exempt from sale for unpaid taxes for two years from the date when such taxes become due and payable, and no penalty for delinquency in the payment of such taxes shall be charged or collected for or during said period, so that Congress may have an opportunity to make provision for the payment of such taxes if the band, or tribal, funds are found insufficient for the purpose.
>
> After the expiration of the tax year following that in which this Act is approved all lands allotted to members of said band, from which restrictions shall have been removed, shall be subject to taxation the same as other lands. But from and after the expiration of said tax year *all restricted allotments and undivided property shall be exempt from taxation* until the restrictions on the alienation of such allotments are removed or the title of the band to such undivided property is extinguished. (emphasis added)

Though at first glance it may seem that "*all* restricted allotments and undivided property shall be exempt from taxation," the Supreme Court has restricted the exemption to income derived directly from the

---

7. The Trial Judge, in a recommended opinion, held for the plaintiff, concluding that such income was exempt. The findings are not printed therein since those relied upon by the court, and necessary to the result, are contained in this opinion.

A threshold issue, presented to our Trial Division, was whether or not Mrs. Critzer's "possessory holdings" were exempt to the same extent as trust allotments on other Indian reservations. The Trial Judge agreed with plaintiff that these "possessory holdings" were equivalent to trust allotments and, therefore, covered by the tax-exempting provisions of the Act of June 4, 1924, 43 Stat. 376, 25 U.S.C. § 331 (note) (1976). The Government has chosen not to reargue this issue before us.

land.[8] Mrs. Critzer says her income *is* directly derived from the land. Her buildings sit on the land; her businesses are conducted in the buildings; the beautiful view, which attracts customers to her motel, is derived from the land. On the other hand, the Government argues that income can only be considered as derived directly from tax exempt Indian land where the essential and primary source of the revenue is the land itself.

The point of departure for our consideration of this matter is *Squire v. Capoeman*, 351 U.S. 1, 76 S.Ct. 611, 100 L.Ed. 883 (1956). There the Government had sought to tax an Indian's capital gain resulting from the severance and sale[9] of timber on allotted land. The sale of the timber had substantially reduced the value of the land and the Court held that to impose a tax would violate the Government's promise to transfer the fee to the allottee " 'free of all charge or incumbrance whatsoever.' "[10] The Court went on to say that "[t]he purpose of the allotment system was to protect the Indians' interest and 'to prepare the Indians to take their place as independent, qualified members of the modern body politic.' "[11]

As to the method for accomplishing this purpose, the Court stated that "it is necessary to preserve the trust and *income derived directly therefrom*, but it is not necessary to exempt reinvestment income from tax burdens."[12] (emphasis added) The reference to reinvestment income was necessary to distinguish the case from the earlier decision in *Superintendent of Five Civilized Tribes v. Commissioner*, 295 U.S. 418, 55 S.Ct. 820, 79 L.Ed. 1517 (1935). The Indian taxpayer in *Superintendent* had re-

invested the income surplus from his allotment and the Supreme Court held that the *reinvestment* income was taxable.

Following *Capoeman*, the IRS published Revenue Ruling 56–342 [13] stating it would treat income "derived directly from allotted and restricted Indian lands" as exempt from the federal income tax. "Such exempt income includes rentals (including crop rentals), royalties, proceeds of sales of the natural resources of such land, and income from the sale of crops grown upon the land and from the use of the land for grazing purposes." [14]

Two years later, the IRS tried to limit the exemption, stating that it would not be available to proceeds from the sale of cattle raised on allotments.[15] This Ruling was found to operate to the detriment of an allottee who used his land for grazing *vis a vis* one who rented his land to others for grazing. The IRS's solution,[16] to allow part of the proceeds from the sale of cattle or other livestock to be exempt in an amount equivalent to the grazing fees that could have been obtained had the land been so leased, also proved unworkable.[17]

Finally, in Revenue Ruling 62–16 [18] the agency said:

\* \* \* \* \* \*

Upon further consideration and in view of the difficulties . . . in allocating the portion of livestock sales proceeds attributable to the land and the portion attributable to other factors, such as labor, the use of equipment, and the like, the determination has been made to treat the full sums received as "derived directly" from the lands within the meaning of Revenue Ruling 56–342, just as in similar circumstances, under that Ruling, pro-

---

8. *Squire v. Capoeman*, 351 U.S. 1, 76 S.Ct. 611, 100 L.Ed. 883 (1956); *see Big Eagle v. United States*, 300 F.2d 765, 156 Ct.Cl. 665 (1962).

9. The sale was made by the Department of Interior in its capacity as trustee.

10. 351 U.S. at 6–7, 76 S.Ct. at 615.

11. *Id.* at 9, 76 S.Ct. at 616.

12. *Id.*

13. Rev.Rul. 56–342, 1956–2 Cum.Bull. 20.

14. *Id.*

15. Rev.Rul. 58–64, 1958–1 Cum.Bull. 12.

16. Rev.Rul. 60–377, 1960–2 Cum.Bull. 13.

17. *See* Rev.Rul. 62–16, 1962–1 Cum.Bull. 7, 8.

18. *Id.*

---

ceeds from the sale of crops grown upon trust allotments are so treated.

Plaintiff argues that her income falls within the category of being "directly derived" under *Capoeman*. Referring to the IRS policy of exempting income from farming and ranching operations, *supra*, she argues that her income is indistinguishable in principle and should be likewise exempt. Since plaintiff's possessory holdings are ill-suited for farming or ranching, she claims that her land is being put to its "highest, best, and most natural possible use" and the income is "just as much 'directly derived from the land'" as a farmer's or a rancher's.[19]

We do not agree. Income from businesses such as plaintiff's is *not directly derived from the land*. While there have been cases since *Capoeman* upholding exemptions from income tax, they have dealt with activities unlike Mrs. Critzer's. *See, e. g., Stevens v. Commissioner*, 452 F.2d 741 (9th Cir. 1971) (farming and ranching operations); *United States v. Daney*, 370 F.2d 791 (10th Cir. 1966) (bonuses for oil and gas leases); *Big Eagle v. United States*, 300 F.2d 765, 156 Ct.Cl. 665 (1962) (royalty income from tribal mineral deposits). Plaintiff has been unable to refer us to any case extending an exemption from federal income tax to business or rental income such as is found here. To agree with plaintiff would require us to ignore the word "directly" in the "directly derived" test.

How can it legitimately be said that the cooking of food in a restaurant creates income "directly derived" from the land? The same point can be made concerning maids making beds, maids cleaning a motel, managers, accountants, yardboys, etc. The income derived from operating a motel stems in a far more important fashion from such items as these than it does from the land alone. Mrs. Critzer unquestionably improved the land, but these improvements were paid for primarily out of income that was generated by and reinvested in the motel, the restaurant, gift shop, craft shops, and the apartments. Both the taxpayer and her husband contributed all their time and effort to these enterprises.[20] In other words, labor also played an important part.[21]

The court recognizes, of course, that the land underlying the motel and other pertinent buildings was necessary to the operation of plaintiff's various businesses and other investments. However, Mrs. Critzer is effectively asking us to attribute *all* of her income (with the exception of dividends and interest) to just the land, and to ignore completely her interest in the improvements and the personal services rendered in connection therewith. In our opinion, it is clear that taxpayer's income was attributable primarily to the utilization of the capital improvements constructed on the land and her management of those assets. If plaintiff were to sit in a telephone booth on her Indian land and sell stocks and bonds by phone from the booth, it would be ludicrous to attempt to argue that any income, so earned, was directly derived from the land. At the other end of the spectrum, we have income from the profits derived from the sale of timber hewn from Indian land. *Squire v. Capoeman, supra*. This is easily

---

19. In Rev.Rul. 67–284, 1967–2 Cum.Bull. 53, 56–57, the IRS set up a five-part test for determining if Indian income was exempt:

  (1) the land must be held in trust by the United States;
  (2) the land is restricted and allotted and held for the individual, non-competent Indian rather than the tribe;
  (3) *the income must be "derived directly" from the land*;
  (4) the statute, treaty, or authority evinces Congressional intent that the allotment be used to protect the Indian until he attains competency;

  (5) the language of the authority in question indicates clear Congressional intent that the land is not to be taxed until conveyed in fee simple to the allottee.

20. Until his death in 1966, Mr. Critzer had worked without salary for plaintiff in her various businesses.

21. In *Strom v. Commissioner*, 6 T.C. 621 (1946), *aff'd per curiam*, 158 F.2d 520 (9th Cir. 1947), an Indian's income from fishing on tribal land was taxed. *See Jourdain v. Commissioner*, 71 T.C. No. 87, Docket No. 6021–76 (March 8, 1979).

recognizable as "directly derived" from the land. We believe that for tax purposes the income in the case at bar is more analogous to the sale of stocks and bonds situation than it is to the sale of timber in *Capoeman.*

Again, we do not say that the land is not of *some* value in helping create income such as that realized from the operation of a motel. Even the Government admits that it might be appropriate in certain instances to allocate income based upon the relative value of the land vis-a-vis any improvements or services. However, we do not reach this problem of allocation in the matter of Mrs. Critzer. That issue remains for yet another case on another day, since plaintiff has not raised it in the case at bar.[22]

The benefits sought by the instant taxpayer were designed, many years ago, to shield an oppressed and unsophisticated people. Congress could not have intended that its laws would be used as a sword by which one group of businessmen could obtain perpetual and total tax shelters that are unavailable to all others, including Indians who have left their reservations to establish businesses elsewhere. *See Mescalero Apache Tribe v. Jones,* 411 U.S. 145, 157, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973).

It does not require great imagination to visualize this type of situation going further and further until exemptions are claimed for lawyers, doctors, steel mills, even a person selling stocks and bonds and running an investment business from a telephone booth on Indian land. There is no precedent for exempting the income merely because the business or building involved is located on tax-exempt land. There is no precedent for exempting the income claimed to be tax free by Mrs. Critzer in the case at bar. If Congress wishes to exempt any class of citizens from the federal income tax, it knows how to do it. We have no authority to do so.

In summary, it is clear in this case that the income in question was not derived directly from the land, but rather emanated primarily from taxpayer's substantial investment in her improvements and her business activities related to those assets. There is no legal reason why this type of income should escape taxation while all other taxpayers, including Indians who work and operate businesses off the reservation, must pay their fair share of taxes.

We hold, therefore, that income realized by an Indian landholder in the operation of a motel, a restaurant, gift shop, and from building rentals, is not income directly derived from the land and is not immune from federal income tax simply because the businesses and buildings are physically located on tax-exempt reservation land.

## II.

Plaintiff further argues, relying on *United States v. Rickert,* 188 U.S. 432, 442, 23 S.Ct. 478, 47 L.Ed. 532 (1903), that because the land itself is tax-exempt, her permanent improvements upon the land are also exempt. This argument, though superficially appealing, fails to consider the *type* of tax involved here. Unlike the *property* tax in *Rickert,* here we are faced with an *income* tax. The Supreme Court has recently underscored this distinction in *Mescalero Apache Tribe v. Jones,* 411 U.S. 145, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973). There, the State of New Mexico sought to tax a ski resort operated by an Indian tribe and located on land tax-exempt under a special statute, 25 U.S.C. § 465. The Court permitted a state gross receipts tax (akin to an income tax), but struck down the state compensating use tax (which it compared to a property tax).

The *Mescalero* Court distinguished *Capoeman,* noting that taxing proceeds from the sale of timber where the timber constituted

---

22. While this case only involves the tax year 1971, Mrs. Critzer has pending in the Tax Court suits involving the years 1963–70 and 1972–73. Plaintiff is represented by very competent counsel, and we are satisfied that it was a considered judgment not to ask for an alloca-tion in this case. We decline to speculate as to whether or not it would have been possible to consider some part of plaintiff's income "directly derived" from the land, since we have not had the advantage of either briefs or oral argument on this issue.

the major value of the Indian's allotted land would have frustrated Congress's purpose. 411 U.S. at 156 n. 12, 93 S.Ct. 1267. However, the Court found no inconsistency with the intent of the Indian Reorganization Act in permitting a nondiscriminatory state gross receipts tax (i. e., permitted an "income tax") and refused to "imply an expansive immunity from ordinary income taxes that businesses throughout the State are subject to." *Id.* at 156 n. 12 and 157, 93 S.Ct. at 1275.

The Act of June 4, 1924 upon which plaintiff bases her exemption claim, states that "restricted allotments . . . shall be exempt from taxation . . . ." *Id.* § 21. However, the Court in *Mescalero* refused to imply an exemption for state income tax purposes from a statute which reads "such lands or rights shall be exempt from State and local taxation," 25 U.S.C. § 465, and they held that exemption limited to taxes akin to property taxes.

It would appear that there is no authority whatever to support the notion that, for *income tax purposes*, permanent improvements erected on tax-exempt Indian land acquire the same status as the land itself. The case law cited by the plaintiff involved questions relating to the authority of state and local governments to impose property taxes of one kind or another on the assets of Indians. However, different legal principles are involved in the case at bar. Simply stated, whether realty or personalty owned by the instant taxpayer, or any other Indian, can or cannot be taxed by a state, county, or municipality, has no bearing on the dispositive issue here, *i. e.*, whether the *income* produced by an Indian's use of that property satisfies the Supreme Court's derived-directly-from-the-land standard and is thereby free of federal tax.

Moreover, the certificates of possessory holdings issued to taxpayer refer only to the right to use and occupy land, and they expressly state that "any improvements placed upon the land are considered to be the personal property of the possessory holder in which the Band has no interest."

Tax exemptions, even those affecting Indians, are not granted by implication. Rather, if Congress intends to exempt certain income, it must do so by a definite expression. *See Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 156, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973); *Squire v. Capoeman*, 351 U.S. 1, 6, 76 S.Ct. 611, 100 L.Ed. 883 (1956); *Oklahoma Tax Commission v. United States*, 319 U.S. 598, 606–07, 63 S.Ct. 1284, 87 L.Ed. 1612 (1943).

Therefore, we hold a property tax exemption on Indian lands, which extends to permanent improvements on that land, is not an exemption for *income tax purposes* for income not derived directly from the land itself.

As mentioned *supra*, the issue of exemption now before us was severed by the Trial Judge. There still remain several other issues, including among others whether taxpayer understated income received from other sources and whether she was negligent in failing to file her return when due, as well as a Government counterclaim.

In summary, we hold that income realized by an Indian landholder in the operation of a motel, a restaurant, gift shop, and from building rentals, is not income directly derived from the land and is not immune from federal income tax simply because the businesses and buildings are physically located on tax-exempt reservation land. Further, we hold a property tax exemption on Indian lands, which extends to permanent improvements on that land, is not an exemption for income tax purposes for income not derived directly from the land itself.

### CONCLUSION OF LAW

Upon the foregoing opinion and findings therein, the court concludes as a matter of law that plaintiff's income is not tax-exempt. The case is remanded to the Trial Division for further proceedings not inconsistent with this opinion.