**Charles E. and Carol M. SAUNOOKE, et al., Plaintiffs,**

· v.

**The UNITED STATES, Defendant.**

No. 129–85T.

United States Claims Court.

Feb. 14, 1986.

See also, 8 Cl.Ct. 327.

Charles A. Hobbs, Washington, D.C., for plaintiffs; Orville Coward, Sylva, N.C.; Steve C. Horowitz, Gastonia, N.C.; and Theodore A. Shields, Hobbs, Straus, Dean & Wilder, Washington, D.C., of counsel.

Theodore D. Peyser, Washington, D.C., with whom were Mildred L. Seidman and Acting Asst. Atty. Gen., Roger M. Olsen, for defendant.

## OPINION

NETTESHEIM, Judge.

This case is before the court on cross-motions for summary judgment and explores the issue of the exemption from federal income taxation for income allocable to Indian lands that are held in trust by the United States when the land arguably plays a role in generating the income.

## FACTS

The following material facts that are not a matter of statute, regulation, caselaw, or agency interpretation have been stipulated or are not disputed. Charles E. Saunooke, Charles Bradley, Carolyn Crowl, and Nathan Robinson, all enrolled members of the Eastern Band of Cherokee Indians (the "Tribe"), a federally recognized tribe residing in North Carolina, along with their spouses ("plaintiffs"), commenced this action seeking a refund of federal income taxes pursuant to Internal Revenue Code ("I.R.C.") § 7422, 26 U.S.C. § 7422 (1982). At issue in this case are tax years 1971–75 and 1977–82.

Plaintiffs each have "possessory holdings" on the Eastern Cherokee Reservation and derive income from commercial establishments operated on these holdings. The businesses are part of the dominant tourism industry and include gift shops, restaurants, motels, and a gas station. Plaintiffs allege that they are entitled to exclude from income a portion of the annual reve-

nue generated by their commercial operations equivalent to the fair rental value of each "possessory holding." Plaintiffs Saunooke, Bradley, Crowl, and Robinson seek refunds in the amounts of $64,907.67, $13,110.60, $4,307.58, and $3,335.67, respectively.

The reservation land on which plaintiffs' commercial operations are located is owned by the United States in trust for the Tribe pursuant to the Act of June 4, 1924, Pub.L. No. 190, 43 Stat. 376 (codified at 25 U.S.C. § 331 note (1982)) (the "1924 Act"). The 1924 Act contemplated a procedure under which the Cherokee lands would be allotted to tribal members. Before executing any allotments under the 1924 Act, Congress enacted the Indian Reorganization Act of 1934, Pub.L. No. 383, 48 Stat. 984 (codified at 25 U.S.C. §§ 461–479 (1982)) (the "Reorganization Act"). In promulgating the Reorganization Act, and thereby amending the allotment system under the 1924 Act, Congress sought to correct a problem that had arisen under other allotment systems. Under these allotment plans, the distributed land had the capacity to ripen into fee title, and Indians had the ability to, and were, alienating their fee interests to non-Indians, thereby disrupting reservation lands. The Reorganization Act avoided this problem on the Eastern Cherokee Reservation by precluding the Cherokee allottee from gaining a fee interest in his distributed parcel.

Prior to 1960 it was recognized by Cherokee tribal resolution that members who were designated reservation land held an exclusive right to use the parcel. Beginning in 1960 the Tribe formalized this right of land use through the issuance of Certificates of "Possessory Holding." The Tribal Code recognized that although the United States holds legal title to the possessory holdings, parcels are held in trust for the Tribe. The Code also indicates that control over a Certificate holder's ability to lease, transfer, or devise his parcel rests with the Tribe. The Tribe controls the creation of easements and the cutting of timber on the holdings and maintains rights in minerals. When a tribal member dies, his possessory holding passes to his heirs or devisees, provided they are members of the Tribe.

Section 21 of the 1924 Act, 43 Stat. 381, governs the taxation of lands allotted thereunder, as follows:

That all lands, and other property, of the band, or the members thereof, except funds held in trust by the United States, may be taxed by the State of North Carolina, to and including the tax year following the date of this Act. Such taxes shall be paid from the common funds of said band for such period, except upon such tracts as shall have been lawfully sold prior to the date when tax assessments can be made thereon under the State law. All tax assessments made pursuant to this Act on restricted allotments or undivided tribal property held in trust by the United States shall be subject to revision by the Commissioner of Indian Affairs for a period of one year following the date when such assessments are spread on the local tax rolls, but if he shall take no action thereon during said year, such assessments shall be final, but this shall not be construed to deprive any allottee of any remedy to which he would be entitled under the State law: Provided, That such restricted and undivided property shall be exempt from sale for unpaid taxes for two years from the date when such taxes become due and payable, and no penalty for delinquency in the payment of such taxes shall be charged or collected for or during said period, so that Congress may have an opportunity to make provision for the payment of such taxes if the band, or tribal, funds are found insufficient for the purpose.

After the expiration of the tax year following that in which this Act is approved all lands allotted to members of said band, from which restrictions shall have been removed, shall be subject to taxation the same as other lands. But from and after the expiration of said tax year *all restricted allotments and undivided property shall be exempt from taxation until the restrictions on the alienation of such allotments are re-*

*moved or the title of the band to such undivided property is extinguished.*

(Emphasis added.) In short, section 21 precludes the taxation of an allotment until the allotment is held in fee or freely alienable by the allottee.

Section 21 reflects Congress' anticipation over 60 years ago that ultimately all Indian lands would either be owned in fee or freely alienable and fully subject to federal income tax. However, Congress itself rendered impossible the occurrence of any of these events in 1934 by promulgating the Reorganization Act. Although the Reorganization Act foreclosed tribal land from ripening into fee title, thereby preventing alienation and the dissipation of the Cherokee tribal unit, it also eliminated the prospect of the taxation of tribal lands under section 21 of the 1924 Act.

In *Squire v. Capoeman*, 351 U.S. 1, 76 S.Ct. 611, 100 L.Ed. 883 (1956), the Supreme Court examined the extent to which Indian income should be exempt from federal income taxation and concluded that Congress, in section 5 of the General Allotment Act of 1887, 24 Stat. 388–389 (codified at 25 U.S.C. §§ 331–358 (1982)) (the "General Allotment Act"), and the amendment to section 6 of the Act of May 8, 1906, Pub.L. No. 149, 34 Stat. 182 (codified at 25 U.S.C. § 349 (1982)), created a tax exemption for income an Indian "derived directly" from his trust land. Applying the test to the facts in *Capoeman*, the Court held that income from the sale of timber on allotted land is "derived directly" from that land and therefore not subject to federal income tax.[1]

Following *Capoeman*, the Internal Revenue Service (the "IRS") issued Rev.Rul. 56–342, 1956–2 C.B. 20, which added to the list, initiated before *Capoeman*, of the forms of income considered "derived directly" from allotted and restricted Indian lands:

Such ... income [exempt from taxation] includes rentals (including crop rentals), royalties, proceeds of sales of the natural resources of such land, and income from the sale of crops grown upon the land and from the use of the land for grazing purposes.

In 1958 the IRS promulgated Rev.Rul. 58–64, 1958–1 C.B. 12, to interpret the closing phrase in Rev.Rul. 56–342 exempting "income ... from the use of the land for grazing purposes." According to Rev.Rul. 58–64, the phrase "does not refer to income received from the sale of cattle, poultry, or other animals which were raised on the allotted land." Such income was not deemed "derived directly" from the land and therefore was rendered taxable. In Rev.Rul. 60–377, 1960–2 C.B. 13, the IRS recognized that Rev.Rul. 58–64 effectively denied a tax exemption to Indians who raise cattle on their own allotments, while Indians who lease their allotments were entitled to treat their grazing fees as exempt income under Rev.Rul. 56–342. The IRS remedied the inconsistency by extending in Rev.Rul. 60–377 the exemption accorded income "derived directly" from the land "to that portion of the proceeds from the sale or exchange of cattle [as well as other livestock] attributable to the grazing capacity of the land."

---

**1.** Contrary to defendant's suggestion, it is of no moment that this case involves the tax exemption provided for in section 21 the 1924 Act, not the General Allotment Act, which the Supreme Court in *Capoeman* construed as permissive of a tax exemption. The purpose of both the 1924 Act and the General Allotment Act to exempt Indian land from taxation until it ripens into a patent in fee is identical. *See Capoeman*, 351 U.S. at 8, 76 S.Ct. at 615. Nor is it relevant that this case involves possessory holdings and *Capoeman* involved allotments. *Hale v. United States*, 579 F.Supp. 646, 648 (E.D.Wash.1984), *appeal dismissed*, No. 84–3691 (9th Cir. Nov. 27, 1984), recognized that *Critzer v. United States*,

220 Ct.Cl. 43, 597 F.2d 708 (en banc), *cert. denied*, 444 U.S. 920, 100 S.Ct. 239, 62 L.Ed.2d 176 (1979), applied the law of the General Allotment Act to facts pertaining to "possessory holdings." The only difference between the two interests is that a possessory holding does not ever ripen into a patent in fee. *Hale*, 579 F.Supp. at 648. Further, in 1923 Congress rendered applicable the General Allotment Act to all lands purchased by Congress for the use or benefit of any tribe of Indians. Such lands include those resided upon by the Eastern Cherokee Indians. *See* Act of Feb. 14, 1923, Pub.L. No. 412, 42 Stat. 1246 (codified at 25 U.S.C. § 335 (1982)).

Rev.Rul. 60–377 contained a formula for determining the value of the newly created exemption. The fair rental value of the land for grazing purposes was chosen as the focal point for the calculation. Because this formula proved difficult to apply, the IRS issued Rev.Rul. 62–16, 1962–1, C.B. 7, revoking Rev.Rul. 60–377 and making the final modification to Rev.Rul. 56–342. Under the modification, attribution was not required; instead, the full sum received as proceeds from the sale or exchange of livestock was deemed "derived directly" from the land.

Among decisions concerning the taxation of land-based Indian income,[2] the United States Court of Claims reached a conclusion consistent with *Capoeman*, but indicated a willingness to expand its holding. In *Critzer v. United States,* 220 Ct.Cl. 43, 597 F.2d 708 (en banc), *cert. denied,* 444 U.S. 920, 100 S.Ct. 237, 62 L.Ed.2d 176 (1979), the court held that income derived from businesses, similar to those operated by plaintiffs in this case, that were located on "possessory holdings" on the Eastern Cherokee Reservation was not "derived directly" from the land and therefore was subject to taxation. The court went on to state:

> Again, we do not say that the land is not of *some* value in helping create income such as that realized from the operation of a motel. Even the Government admits that it might be appropriate in certain instances to allocate income based upon the relative value of the land vis-a-vis any improvements or services. However, we do not reach this problem of allocation in the matter of Mrs. Critzer. That issue remains for yet another case on another day....

220 Ct.Cl. at 53, 597 F.2d at 714 (emphasis in original). After pursuing their remedies before the IRS, plaintiffs filed their complaint in this court. Class action certifica-

tion was denied, 8 Cl.Ct. 327 (1985), and the named plaintiffs proceeded on their own behalf.

Plaintiffs' fundamental contention is that the Supreme Court's decision in *Capoeman* did not define narrowly the sources of income that were deemed "derived directly" from the land. From this premise, and in accord with *Critzer*, plaintiffs contend specifically that the portion of their business income allocable to the fair rental value of the land comprising their possessory holdings should be excluded as income "derived directly" from the land within the meaning of *Capoeman*. Defendant argues that the income for which plaintiffs seek an exemption is not "derived directly" from the land.

## DISCUSSION

1. In *Squire v. Capoeman,* 351 U.S. 1, 76 S.Ct. 611, 100 L.Ed. 883, the Supreme Court held that the exemption from taxation accorded Indian income by the General Allotment Act extends only to that income which is "derived directly" from the land. The Court acknowledged that it adopted the phrase "derived directly" from the writings of Felix S. Cohen, renowned for his expertise in Indian Affairs. *See* F.S. Cohen, *Handbook of Federal Indian Law* 265 (1942).

In applying the phrase "derived directly," the Court endeavored to defer to the purpose of the allotment system "to protect the Indians' interest and 'to prepare the Indians to take their place as independent, qualified members of the modern body politic.'" *Capoeman,* 351 U.S. at 9, 76 S.Ct. at 616 (quoting *Board of Commissioners v. Seber,* 318 U.S. 705, 715, 63 S.Ct. 920, 926, 87 L.Ed. 1094 (1943)). Holding that income derived from the sale of timber is tax exempt, the Court stated:

> Respondent's timber constitutes the major value of his allotted land.... Once

---

**2.** *See Stevens v. Comm'r,* 452 F.2d 741 (9th Cir. 1971) (income from farming and ranching held tax exempt); *United States v. Daney,* 370 F.2d 791 (10th Cir.1966) (bonus income received for execution of oil and gas leases held tax exempt); *United States v. Hallam,* 304 F.2d 620 (10th

Cir.1962) (income derived from rentals, royalties, and sale of chattels held tax exempt); *Hayes Big Eagle v. United States,* 156 Ct.Cl. 665, 300 F.2d 765 (1962) (royalties from mineral deposits held tax exempt).

logged off, the land is of little value.... It can no longer be adequate to his needs and serve the purpose of bringing him finally to a state of competency and independence. Unless the proceeds of the timber sale are preserved for respondent, he cannot go forward ... with the necessary chance of economic survival in competition with others....

351 U.S. at 10, 76 S.Ct. at 617 (footnote omitted). Thus, under the Supreme Court's formulation of the test in *Capoeman,* income "derived directly" from the land is exempt from taxation if the value of the land from which the income is generated is diminished or the land no longer serves the purpose for which allotted. It is under these circumstances only that an Indian's income is exempt from federal income tax.

█ A canon of statutory construction prescribes that statutes pertaining to Indians are interpreted liberally in their favor, *see, e.g., Montana v. Blackfeet Tribe of Indians,* —— U.S. ——, 105 S.Ct. 2399, 2404, 85 L.Ed.2d 753 (1985); *Capoeman,* 351 U.S. 6–7, 76 S.Ct. 615 (quoting *Worcester v. State of Georgia,* 6 Pet. 515, 582 (1832) (Marshall, C.J.)). The Supreme Court in *Capoeman* applied this canon of construction in interpreting the General Allotment Act and creating the parameters of the "derived directly" test. The Court also restated the principle, later acknowledged in *Critzer v. United States,* 200 Ct.Cl. at 55, 597 F.2d at 715, that "[t]ax exemptions, even those affecting Indians, are not granted by implication," but rather by Congress' "definite expression" only. *See Capoeman,* 351 U.S. at 6, 76 S.Ct. at 614. Thus, the test itself as finally developed was not expansive, although the Supreme Court used a liberal canon in formulating it.

The canons of statutory construction also instruct that the effort to define the meaning intended by Congress "must begin with the language employed by Congress and the assumption that the ordinary meaning of that language expresses the legislative purpose." *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.,* 469 U.S. 189, 105 S.Ct.

658, 662, 83 L.Ed.2d 582 (1985) (citation omitted). No reason appears to treat a Supreme Court opinion differently. Taking the Court's language at face value, the construction adopted by the Supreme Court in *Capoeman* was narrow and explicitly so. An expansive application of the narrow "derived directly" test would not be warranted by the Supreme Court's language.

Recently two courts have subscribed to a straightforward reading of *Capoeman.* In *Cross v. Commissioner,* 83 T.C. 561 (1984), *appeal docketed,* No. 85–7365 (9th Cir. July 1, 1985), the United States Tax Court held in an 11–5 decision that neither the net profit from taxpayer's operation of a smokeshop on his allotted land nor the fair rental value of the unimproved land was "derived directly" from the land. The majority stated that "the continued use of the land for retail sales from a smokeshop does not decrease the economic value of the land nor impair the capacity of a competent Indian to 'go forward ... with the necessary chance of economic survival.'" 83 T.C. at 566 (quoting *Capoeman,* 351 U.S. at 10, 76 S.Ct. at 617). The district court in *Hale v. United States,* 579 F.Supp. 646 (E.D.Wash.1984), *appeal dismissed,* No. 84–3691 (9th Cir. Nov. 27, 1984), held taxable income generated by the rental of the land used as a smokeshop. In concluding that the income was not "derived directly" from the land, the court relied upon *Capoeman:* "[F]or income to be 'derived directly' from the land, the allottee must exploit the land itself by mining, logging, agriculture, or similar activity." 579 F.Supp. at 647.

█ Measured against the test articulated in *Capoeman,* the income from plaintiffs' business operations in this case is not "derived directly" from the land. Plaintiffs operate gift shops, restaurants, motels, and a gas station. These operations are land based to the extent that the parcels upon which they lie carry an aesthetic and historical allure. However, the functioning of these establishments does not in any way exploit or reduce the value of plaintiffs' possessory holdings. Conse-

quently, plaintiffs are not entitled to an exemption from taxation.[3]

2. Plaintiffs take the position, consistent with the dissenting judges in *Cross, see* 83 T.C. at 573, that satisfaction of the "derived directly" test does not require a diminution in the value of the land. Discussion will focus upon the analysis in the *Cross* dissent because it deals with and embellishes upon plaintiffs' argument.

The *Cross* dissent relies upon *Stevens v. Commissioner*, 452 F.2d 741 (9th Cir.1971), to argue that *Capoeman* is "'not a technical or narrow decision'" *Cross*, 83 T.C. at 571 (quoting *Stevens*, 452 F.2d at 744), and that section 5 and the amendment to section 6 of the General Allotment Act were not intended to subject an Indian allotment to taxation until the allotment ripens into a patent in fee. The *Cross* dissent concludes that rental income from trust land, whether or not received for activities which exploit the land, is exempt to the individual allottee. Building upon the premise that rental income is exempt, the dissent states: "I think there is no sound basis for treating differently the income of ... [an] Indian from activities [*i.e.,* the operation of a smokeshop in *Cross* or commercial operations such as plaintiffs'] he himself conducts on his allotted land, to the extent that such income is attributable to the trust land itself rather than to the improvements, inventory, or personal services...." 83 T.C. at 574.

To support its argument that the Supreme Court necessarily intended to exempt from taxation rental income as "derived directly" from the land, the *Cross* dissent analyzes the authorities cited in *Capoeman:*

In articulating the ["derived directly"] test, the Supreme Court relied upon a treatise by the noted Indian law expert,

Felix S. Cohen. See F. Cohen, *Handbook of Federal Indian Law* 265–266 (1941). Cohen had taken the phrase from an early Solicitor's Memorandum. *See* S.M. 5632, V–1 C.B. 193, 196 (1926). There the Solicitor's Memorandum, discussing Indian allottees under the Act of May 8, 1906, 34 Stat. 182, stated:

These provisions clearly indicate that before the issuance of a fee simple patent such restricted land is exempt from taxation. The land being exempt from taxation, it follows that income directly derived from such land is also exempt....

*See also* T.D: 3570, III–1 C.B. 85 (1924), and T.D. 3754, IV–2 C.B. 37 (1925), both opinions of the Attorney General adopted as Treasury decisions and cited with approval by the Supreme Court in *Squire v. Capoeman*, 351 U.S. at 8 [76 S.Ct. at 615]. These rulings, in turn, all relied on the landmark case of *Pollock v. Farmers' Loan & Trust Co.*, 157 U.S. 429, 581 [15 S.Ct. 912, 39 L.Ed. 1108] (1895), *vacated on other grounds* 158 U.S. 601 [155 S.Ct. 912, 39 L.Ed. 1108] (1895), holding, *inter alia*, that *a tax on the rental income from real estate was a direct tax on the land.*

*Cross*, 83 T.C. at 571 (emphasis added; citation omitted).

This analysis ignores the plain meaning of *Capoeman* and on this basis departs from the reasoning of the majority and the court in *Hale*. Although it is difficult to go behind the language used by the Supreme Court to conform what the Supreme Court said it derived from cited authorities with what they actually say, the *Cross* dissent does so in order to reach the conclusion that *Capoeman* is to be broadly construed. Whatever the merits of this approach, it is not supportive of its intended proposition.

---

**3.** It may be true that the property at issue is not suitable for "mining, logging, agricultural, or similar [activities]," *Hale*, 579 F.Supp. at 647, and income from plaintiffs' operations never could qualify for an exemption from taxation. This, however, does not render the reasoning in *Capoeman* inapplicable or require granting plaintiffs' exemption. The "derived directly"

test as developed in *Capoeman* was intended to exempt income of Indians who conducted operations exploitative of their allotments. For plaintiffs, whose operations do not in any way diminish the value of their possessory holdings or their future earning capacity, an exemption from taxation would supply a windfall.

The *Cross* dissent correctly recognizes that both T.D. 3570 and T.D. 3754, formerly opinions of the Attorney General, cite *Pollock v. Farmers' Loan & Trust Co.,* 157 U.S. 429, 15 S.Ct. 673, 39 L.Ed. 759, for the proposition that a tax on rental income is a direct tax on land and that *Capoeman* cites both of these Treasury decisions. The *Cross* dissent, however, fails to recognize that *Capoeman* does not cite *Pollock* and goes no further than to state, "On the basis of these opinions and decisions, and a series of district and circuit court decisions, [4] it was said by Felix S. Cohen ... that 'It is clear that the exemption accorded tribal and restricted Indian lands extends to the income derived directly therefrom.... ' " *Capoeman,* 351 U.S. at 8–9, 76 S.Ct. at 616 (footnote omitted) (quoting F.S. Cohen, *Handbook of Federal Indian Law, supra,* 265).[5]

The premise for the *Cross* dissent's argument is that, because the Supreme Court in *Capoeman* cited T.D.'s 3570 and 3754 and Cohen's treatise in developing the "derived directly" test, the Court necessarily relied upon these authorities in their entirety.[6] A further premise is that *Capoeman* cited these decisions for the same proposition that these decisions and the *Cross* dissent cite *Pollock.* As defendant argues, however, *Pollock* does not hold that a tax on rental income is a direct tax on land. In *New York ex rel. Cohn v. Graves,* 300 U.S. 308, 315, 57 S.Ct. 466, 468, 81 L.Ed. 666 (1936) ("*Graves I*"), decided before *Capoe-*

man, the Supreme Court said of its decision in *Pollock:*

> There the question for decision was whether a federal tax on income derived from rents of land is a direct tax [on land] requiring apportionment under Art. I, § 2, Cl. 3 of the Constitution. *In holding that the tax was "direct," the Court did not rest its decision upon the ground that the tax was a tax on the land,* or that it was subject to every limitation which the Constitution imposes on property taxes. It determined only that for purposes of apportionment there were similarities in the operation of the two kinds of tax which made it appropriate to classify both as direct, and within the constitutional command.

*Id.* (emphasis added) (citing cases); *accord Graves v. New York ex rel. O'Keefe,* 306 U.S. 466, 481–82, 59 S.Ct. 595, 598–99, 83 L.Ed. 927 (1939) (tax on income from source is no longer "legally or economically" a tax on its source).[7]

The conclusion flowing from this morass of authorities is that *Capoeman* borrowed from Cohen's treatise only the notion of the "derived directly" test and developed a narrow meaning for it in broadly construing the General Allotment Act to exempt income generated by trust lands from federal taxation. This reading of *Capoeman* is consistent with the Supreme Court's language and avoids second-guessing in 1986 what the Supreme Court meant in 1956.[8]

**4.** *See Pitman v. Comm'r,* 64 F.2d 740 (10th Cir. 1933); *Chouteau v. Comm'r,* 38 F.2d 976 (10th Cir.1930); and *United States v. Homeratha,* 40 F.2d 305 (W.D.Okla.1930), *appeal dismissed,* 49 F.2d 1086 (10th Cir.1931).

**5.** Although Cohen's treatise does recognize that rental income has been held to be tax exempt, *see* F. Cohen, *Handbook of Federal Indian Law, supra,* 265 & nn. 99–102, it cites only T.D. 3754 and, as *Capoeman,* does not cite *Pollock* directly.

**6.** Opinions of the Attorney General, the status formerly held by T.D.'s 3570 and 3754, are not binding on the courts. *See Lewis Publishing Co. v. Morgan,* 229 U.S. 288, 311, 33 S.Ct. 867, 873, 57 L.Ed. 1190 (1913).

**7.** *Graves I* held that the State of New York could tax the rental income received by a resident of

New York from land located in New Jersey. Plaintiff contends that *Graves I* is inapposite because it does not pertain to Indians and therefore does not apply the canon of construction favorable to Indians. Plaintiffs' argument is particularly unpersuasive given that *Graves I* clarifies *Pollock,* and both plaintiffs and the *Cross* dissent rely upon *Pollock* despite the fact that it, too, is a non-Indian case.

**8.** The contention is also made in the *Cross* dissent that "[t]he purpose of Supreme Court's 'derived directly' test in *Squire v. Capoeman* ... was not to narrowly circumscribe the types of income that could be considered as directly derived from the land." 83 T.C. at 572. According to the *Cross* dissent, the purpose was to distinguish the court's holding in *Superintendent of Five Civilized Tribes v. Comm'r,* 295 U.S. 418, 55 S.Ct. 820, 79 L.Ed. 1517 (1935).

Even if the premise of the *Cross* dissent were correct and *Capoeman,* in fact, cited T.D.'s 3570 and 3754 for the proposition that these decisions cited *Pollock,* the result in this case would not change.

3. Plaintiffs argue, and the *Cross* dissent suggests, that the IRS supports the conclusion that *Capoeman* is not a narrow decision requiring a diminution in the value of land to satisfy the "derived directly" test. As finally modified, Rev.Rul. 56–342, 1956–2 C.B. 20, indicates that *Capoeman* is permissive of an exemption from taxation for rental income. The ruling implies that such income satisfies the "derived directly" test. In this respect Rev.Rul. 56–342 is inconsistent with the language of *Capoeman.* To buttress the ruling it is not only necessary to rely on all the authority cited by *Capoeman,* such as T.D.'s 3570 and 3754, and sources cited within those decisions, such as *Pollock,* but it also requires presuming that the Supreme Court in *Capoeman* overlooked the decision in *Graves* and applied to *Pollock* the same erroneous holding that the *Cross* dissent has attributed it. In any event, revenue rulings are not binding upon this court. *See, e.g., Columbus Fruit & Vegetable Cooperative Ass'n v. United States,* 7 Cl.Ct. 561, 564–65 (1985) (citing cases).

Although defendant does not go so far as to contend that there is no premise supportive of Rev.Rul. 56–342, the Government concedes that the ruling provides a generous interpretation of the "derived directly" test in *Capoeman.* Defendant marshals a persuasive argument for the proposition that the ruling is logically consistent with a reasonable interpretation of the test. As finally modified by Rev.Rul. 62–16, Rev. Rul. 56–342 permits an exemption from taxation for rentals, royalties, proceeds from the sale of natural resources and crops derived from the land, from livestock raised on the land, and from use of the land for grazing purposes. The sources of income referred to in the ruling are land based, with a genesis requiring, for the most part, an exploitation of the land. In defendant's view the logic of the Revenue Ruling is that it does not permit an exemption from taxation for income generated by improvements, such as plaintiffs' enterprises, constructed upon the land, but only for income traceable to the land itself.[9]

4. Plaintiff's final argument for extending *Capoeman* beyond its plain meaning, with the exception of policy arguments,[10] relies upon *Critzer,* 220 Ct.Cl. 43, 597 F.2d 708. In holding that income from the operation of a restaurant, gift shop, motel, and improved rental property was not exempt

*Capoeman* did distinguish *Superintendent* as it relates to the "derived directly" test. However, *Superintendent* was referred to by the Court only because the Government had relied upon it to argue that the plaintiff in *Capoeman* was not entitled to an exemption from income. *Superintendent* held that so-called "reinvestment" income or " 'income derived from investment of surplus income from land' " was not exempt from taxation. *Capoeman,* 351 U.S. at 9, 76 S.Ct. at 616 (quoting *Superintendent,* 295 U.S. at 421, 55 S.Ct. at 822). The Court did not speak to diminution in value or exploitation of the land to present a sharp contrast between removal of timber and generation of reinvestment income, as the *Cross* dissent argues. Instead, the court spoke of diminution in value or exploitation of the land as concepts that were consistent with the purpose of the taxation exemption afforded by the General Allotment Act. *See* 351 U.S. at 10, 76 S.Ct. at 617.

**9.** Plaintiffs and the *Cross* dissent together cite all the following cases: *United States v. Da-*

*ney,* 370 F.2d 791 (10th Cir.1966), *United States v. Hallam,* 304 F.2d 620 (10th Cir.1962), *Bagby v. United States,* 60 F.2d 80, (10th Cir.1932) and *Snell v. Comm'r,* 10 B.T.A. 1081 (1928). These cases stand for the general proposition that income from an Indian's allotted land is tax exempt if the land itself is exempt and for the specific conclusion that rental income from trust land is exempt. *Capoeman* exempts from taxation as "derived directly" from the land only income generated by the sale of timber. From this holding it does not follow that rental income is also exempt. To reach such a conclusion requires ascribing to *Capoeman* a meaning other than its plain one. Accordingly, the decisions which pre-date *Capoeman, Bagby* and *Snell,* are unpersuasive after *Capoeman.* Those cases decided after *Capoeman, Daney* and *Hallam,* must be viewed as inconsistent with it. In any event, these precedents are not binding.

**10.** The court has carefully considered plaintiffs' policy arguments and does not find them persuasive.

from taxation, the Court of Claims in *Critzer* ruled consistently with *Capoeman*'s requirement that the land be diminished or exploited, but did not state expressly that it was doing so. *Critzer* postulates a continuum. At one end the court hypothesizes an Indian selling stock from a phone booth on his possessory holding. At the other end is plaintiff in *Capoeman* selling timber. *Critzer* states that in the former situation, "[i]t would be ludicrous to attempt to argue that any income, so earned, was directly derived from the land, ..." but that in the latter the income "is easily recognizable as 'directly derived' from the land." 200 Ct.Cl. at 52, 597 F.2d at 713–14. Plaintiffs' commercial operations in *Critzer* were considered to be more analogous to the Indian working out of a phone booth.

Plaintiff in *Critzer* sought an exemption for all income derived by her commercial operations. For this reason alone the claim was denied. The Court of Claims recognized that the bare land in question was necessary and did in some way contribute to plaintiff's earned income and further stated that it would be "appropriate in certain instances to allocate income based upon the relative value of the land." 200 Ct.Cl. at 53, 597 F.2d at 714. Thus, it was implied that if plaintiff had sought an exemption for a portion of her income, rather than all of it, the exemption may have been granted to the extent that such income was allocable to her bare land.

Plaintiffs in this case do not seek an exemption for all of their earned income, recognizing that factors other than the land, such as labor and improvements, have contributed to their revenues. Plaintiffs, however, do contend that a part of this income is allocable to the bare land upon

which their commercial operations lie and is to that extent "derived directly" from the land under *Capoeman* and exempt from taxation. Just as in *Cross*, plaintiffs here argue that the exemption should be equal to the fair rental value of the unimproved land upon which their businesses sit.[11]

Plaintiffs' argument must be rejected. The result in *Critzer* is correct because it reflects the plain meaning of *Capoeman*. Nonetheless, the implications of *Critzer* upon which plaintiffs rely concerning income allocation are inconsistent with *Capoeman*'s holding and plain meaning. An exclusion permitted for rental income goes well beyond *Capoeman*'s exemption for income received from the sale of timber. A rule permissive of the allocation of income would sanction an exemption from income in almost every instance, as the land upon which a business lies is by virtue of its very existence essential to the business. Under such a rule, an exclusion from income would be permitted without regard to whether a commercial operation caused a diminution in the value of land. Finally, if an exclusion for rental income is sanctioned, "the word 'direct' has little meaning, for all income connected in any way with the land would then be 'directly derived' from the land...." *Cross*, 83 T.C. at 568.

At the heart of this controversy is the anomaly, pointed out by plaintiffs, that if an Indian rents his possessory holding to someone who operates a gift shop, his rental income is tax exempt, but if the same Indian is industrious enough to run the business himself, the income allocable to rent is taxable. The exemptions that have evolved by revenue rulings and court decisions [12] do present a crazy-quilt pattern. It

---

11. Although plaintiffs suggest that a part of the income earned by the hypothetical stockbroker in the phone booth should be exempt from taxation, they do not contend that their operations should be viewed as analogous. For the stockbroker, the land, although to a degree essential, is merely incidental to his activities, whereas the lands upon which plaintiffs' tourist operations lie possess qualities essential to the very prosperity of the enterprises. Accordingly, plaintiffs argue that an exemption from taxation

is warranted to an even greater extent in their case.

12. The IRS could revisit its long-standing revenue rulings exempting rental income in light of *Graves'* clarification of *Pollock*. *See Fogatry v. United States*, 780 F.2d 1005 at 1011 (Fed.Cir. 1986) (citing *Dickman v. Comm'r*, 465 U.S. 330, 104 S.Ct. 1086, 79 L.Ed.2d 343 (1984)). However, the judicial decisions piggybacked on these

is also true that Congress never intended that the Eastern Cherokee Reservation lands would be shackled perpetually in trust; rather, the original congressional objective was to facilitate fee ownership with all of its incident rights and obligations, including federal tax liability for income generated on the land. Moreover, when Congress halted the progress toward fee ownership while preserving a tax exemption in 1934, it could not have foreseen the nature or extent of economic and commercial utilization of reservation land in the last quarter of this century. *See Missouri Pacific Truck Lines, Inc. v. United States,* 3 Cl.Ct. 14, 27 (1983), *aff'd mem.,* 736 F.2d 706 (Fed.Cir.1984). In these circumstances the temptation to expand further the tax exemption in order to make a more sensible system must give way to restraint and a ruling in harmony with *Capoeman* and the observation that the time has come for action by Congress.

## CONCLUSION

Based on the foregoing, defendant's cross-motion for summary judgment is granted, and plaintiffs' motion for partial summary judgment is denied. The Clerk of the Court shall dismiss plaintiffs' complaint.

No costs.

old rulings, *see supra* note 2, may command a

legislative resolution.